UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

|  |  |  |
|---|---|---|
| STEVEN PRAKEL, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CAROLYN PRAKEL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Case No. 4:12-cv-045-SEB-WGH |
| v. | ) | |
| | ) | |
| THE STATE OF INDIANA, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

This case is about whether the Americans with Disabilities Act and section 504 of the

Rehabilitation Act protect the right of a deaf man to attend and have meaningful access to state

court criminal proceedings involving his mother.  The material facts are undisputed.  Instead, the

parties dispute a question of pure law: whether section 504 of the Rehabilitation Act and Title II

of the ADA require state and local courts to provide deaf spectators with the same access to the

courthouse that it provides hearing spectators.  United States Supreme Court precedent and

federal statutes and regulations unequivocally establish that state and local courts have this

obligation.  Binding precedent and undisputed facts also show that the State of Indiana, the

Division of State Court Administration, and the Indiana Supreme Court are proper defendants.

Throughout the course of this litigation, Defendants have attempted to trivialize this case, but access to the courts is never trivial. Indeed, the U.S. Supreme Court has ruled on both the right of spectators to have access to state court criminal proceedings and the right of individuals with a disability to have access to court proceedings as spectators. Just as courts must provide ramps so that members of the public using wheelchairs may attend court proceedings, the court must provide auxiliary aids and services so that individuals who are deaf have meaningful access to proceedings. For Steven Prakel, meaningful access means that he be able to attend *and understand* court proceedings, just like any other member of the public that observes court proceedings. Defendants admit that they refused multiple requests to provide the interpreters that were necessary for Mr. Prakel to have this access. The refusal to provide access was deliberate, and violated section 504 and Title II.

For the reasons that follow, the Court should GRANT the Prakels' motion for partial summary judgment and DENY the Defendants' motion for summary judgment.

## II.    STATEMENT OF MATERIAL FACTS IN DISPUTE[1]

The parties do not dispute any material facts. Defendants do not dispute that Steven Prakel is an individual with a disability and that Carolyn Prakel, his mother, is associated with an individual with a disability. Defendants concede that Mr. Prakel needs interpreters to understand court proceedings. Defendants concede that Mr. Prakel requested interpreters so that he could have meaningful access to state court criminal proceedings involving his mother, and that

---

[1] Defendants disagree with only twelve statements out of Plaintiffs' eight-page recitation of Material Facts Not in Dispute, meaning that all other statements of fact offered by Plaintiffs must be deemed admitted. Of those twelve disputes, none are material to a finding of liability. Plaintiffs use this title only to comply with Local Rule 56-1(b).

Defendant denied those requests.  Defendants admit that they maintain a policy of providing interpreters for deaf individuals *only* if the deaf individuals are litigants, witnesses, or jurors.  As a result, Defendants' court proceedings, which were open to members of the public, were inaccessible to Mr. Prakel who was a spectator.  Defendants concede that in order for Mr. Prakel to understand court proceedings, the Prakels had to obtain their own interpreter and Defendants concede that the Prakels paid the cost of providing the necessary interpreter services.

Defendants mischaracterize undisputed facts in an attempt to distract the Court and stave off a grant of summary judgment in favor of the Prakels.  A review of the record shows that (i) the State of Indiana, Division of State Court Administration, and Chief Justice Shepard acted in concert with the named judges to deny the Prakels' right to an interpreter; (ii) Defendant's version of events omits material facts and creates a misleading impression of relevant events.

### 1.   Defendants Acted in Concert in Refusing To Provide Necessary Interpreters for Mr. Prakel

While the State, the Division of State Court Administration ("the Division") and the Chief Justice make numerous efforts to distance themselves from responsibility for the discrimination alleged by the Prakels, Defendants have already conceded all facts necessary to find liability against them.  First, the Defendants concede that the Dearborn courts are state entities.  Defs.' Responses to Pl's Requests for Admission [Doc. No. 66-13] at 6.  Second, the Defendants concede that the named judges are paid by the Division of State Court Administration with funds from the state treasury.  Defs.' Br. [Doc. No. 75] at 9 (citing Ind. Code § 33-33-82-29).[2]  Third, the Defendants maintained through discovery and in their briefing

---

[2] Inexplicably, this section of the Indiana code that Defendants cite governs the Vanderburgh County courts. The section of the code governing Dearborn County courts is Ind. Code § 33-33-15.

that the Indiana judiciary, including the Supreme Court and the Dearborn Courts will provide interpreters to litigants, witnesses, and jurors, but will not do so for spectators.  Exh. 2, Defs.' Responses to Steven Prakel's Interrogatories, at 2-3.  Fourth, the State, Division, and Chief Justice concede that they serve as a resource to the trial judges, Remondini Dep. [Doc. No. 74-9] at 9-10, 35:4-20, and that in this case they twice consulted with Judge Humphrey about the Prakels' requests for interpreters, Humphrey Dep. [Doc. No. 74-5] at 16:16-20, 17:20-18:2, 22:13-23:11, after which consultations, the requests for interpreters were denied.  Defs.' Br. [Doc. No. 75] at p. 7, 9, 11.[3]  Fifth, Defendants concede that they provide Language Line access in all trial courts in Indiana in more than 200 languages, but not in sign language.  Letter from Lilia Judson/Division of State Court Administration to the United States Department of Justice, September 4, 2009 [Doc. No. 66-15] at 2; Humphrey Dep. [Doc. No. 66-8] at 27:11-17; 28:8-20; Remondini Dep. [Doc. No. 66-10] at 15:20-17:16; 19:11-13.  Sixth, Defendants concede that they received the requests for reimbursement advising them of their legal obligation to pay for interpreters but did not grant reimbursement to Ms. Prakel of the funds that she was unlawfully required to shoulder.  Defs.' Br. [Doc. No. 75] at 6.

Despite concession of all these material facts, Defendants would have the Court believe that the State of Indiana, Indiana Supreme Court, and the Division of State Court Administration have literally no role in setting state policies and rules for its trial courts, have nothing to do with funding or not funding interpreter provision in the trial courts, and communicating rules and policies to the trial judges whom they pay or advising the trial judges on the application of those

---

[3] While Defendants make much of the lack of "evidence concerning what advice Judge Humphrey received [from the Division] or whether he acted on any such advice," Def.'s Br. [Doc. No. 75] at 11, this is because both Judge Humphrey and the Division's 30(b)(6) designee refused to provide this information in deposition.  *See* Humphrey Dep. [Doc. No. 66-8] at 22:22-23:5; Remondini Dep. [Doc. No. 66-10] at 51:12-17, 62:6-22.

policies. The Defendants' statements to this effect omit information that shows the true extent of their involvement in the provision of interpreting services in trial courts.

A. **Defendants' Statement:**  "The courts, in conjunction with county officials, develop and administer their own budgets each year and set their own policies."  Exh. E, Humphrey Dep. at 6-7.

**Omission:** "The Dearborn County Courts are funded in part through state funds . . . . The Judges' salaries are paid by state funds with a small county supplement."  Exh. 2, Defs.' Responses to Steven Prakel's Interrogatories at 2.  Indiana Supreme Court promulgates the Trial Rules.  *Id.* at 3.  The Trial Rules "govern the procedure and practice in all courts of the state of Indiana."  Indiana R. Trial P. 1.  Further, Chief Justice Shepard previously told the Indiana Legislature of the "advances we have made in Indiana's trial courts, in the county courthouses, or in our city and town courts," stressing that his emphasis on reporting on the advances the Supreme Court has made in the trial courts was necessary because "the Constitution requires that I report to you on the 'condition of the courts' generally and <u>designates my office as Chief Justice of Indiana rather than Chief Justice of the Supreme Court</u>."  Exh. 3, Randall T. Shepard, *2007: "Most Justice Happens in the County Courthouse"* (Jan. 17, 2007) *available at* http://www.in.gov/judiciary/supreme/2358.htm (last visited Dec. 22, 2013) (emphasis added).

B. **Defendants' Statement**: "The Division makes no decisions concerning provision of interpreters or expenditures of money for interpreters. The Division does not have authority to order a trial court to provide interpreter services."  Exh. I, Remondini Dep. pp. 69-70.  "Those decisions reside solely with the trial court judges."  Exh. I, Remondini Dep., at 69-70.

**Omission:** The Division "[h]elp[s] the Chief Justice and Supreme Court manage and regulate judicial workloads, manage and <u>distribute state funding</u> provided for the operation of the courts and related offices, certify and <u>regulate court programs</u> and initiatives, <u>promulgate and implement rules and procedures</u>...."  About the Division of State Court Administration [Doc. No. 66-21] at 1-2 (emphases added). The State, through the Indiana Supreme Court and the Division, funds the provision of language services in all trial courts in the State of Indiana, through provision of a Language Line and Language Line grants.  Letter from Lilia Judson/Division of State Court Administration to the United States Department of Justice, September 4, 2009 [Doc. No. 66-15] at 2. Dearborn courts receive Language Line grant funding and this funding has been used to provide sign language interpreters for litigants in the trial court.  Exh. 4, Responsive Doc. No. 4, Defs.' Response to Steven Prakel's Request for Production at 1-2.

C. **Defendant's Statement:** "The State Defendants have not implemented any consent decrees relating to provision of sign language interpreters in court proceedings."  Defs.' Br. [Doc. No. 75] at 9. "The *Clark* (sic) consent decree to which Plaintiffs refer does not require any action by the Division or by any courts other than the specific court involved

in that one specific proceeding." *Id*. at 9 n.5.

**Omission:** In *Clarke v. Honorable Douglas Bridges and State of Indiana*, the State was a named Defendant.  The Consent Decree charged the *State* with implementing the Consent Decree to ensure access for a deaf litigant in a trial court.  *Clarke v. Honorable Douglas Bridges and State of Indiana* [Doc. No. 66-18] at 1.  As part of the *Clarke* Consent Decree, the State agreed not only to amend Trial Rule 43(F) so that sign language interpreters would be provided to a litigant, but also to disseminate this information to the Indiana Division of State Court Administration, the Indiana Judicial Center, the Chief Justice of the Supreme Court, and to all the trial judges in the relevant circuit court.  *Id*. at 4.

### 2.   Defendants Paint a Misleading Picture with Key Omissions

The Affidavit of Timothy Day ("Day Affidavit"), Day Aff. [Doc. No. 74-1], and

Defendants' "Disputed" Statements E, I, J, and K, Defs.' Br. [Doc. No. 75] at 9-12, omit key

facts and create a misleading version of events.  Defendants' use of the Day Affidavit is

particularly reprehensible because, although Day represented Ms. Prakel at the proceedings in

question, he now works for Defendants as a judge.  The affidavit purports to disclose

*confidential attorney-client communications* during the course of representation and should be

stricken for this reason.  For purposes of complying with Local Rule 56-1, the Prakels respond to

Defendant's Statement of Material Facts as follows:

**D.  Defendants' Statement:** "At that hearing and with Carolyn Prakel by his side, Day told Judge Cleary that an interpreter was not necessary for Mr. Prakel because he was not a witness or participant in the proceeding. Exh. J, Day Aff., ¶¶ 15, 16." Defs.' Br. [Doc. No. 75] at 4.  "Attorney Day advised Judge Cleary that no interpreter was needed and that Steven Prakel would not be participating in the proceedings and need not be present. Exh. C, Cleary Dep. p. 10; Exh. F, Transcript, p. 3." Id.

**Omission #1:**  As the transcript shows, the state court asked both Day and the prosecutor whether interpreters were needed based on the nature of the criminal offense to conduct proceedings.  Transcript of Proceedings, June 23, 2010 [Doc. No. 74-6] at 3.  Day stated that an interpreter was not needed based on the nature of the offense *to conduct* Ms. Prakel's criminal proceedings because Mr. Prakel was not a witness.  That is a different question from whether Mr. Prakel needed an interpreter to understand proceedings and whether he had a right to do so.

**Omission #2:** When Judge Cleary asked, in open court, about the court's legal obligation to provide an interpreter for Mr. Prakel as a spectator, Day stated that he did not know the answer to that question:

> I just don't know if we need to consult with the Judicial Commission or someone to see um, is the Court required to provide him with an interpreter when he is not a witness or a party. I can't answer that, I just, you know, I would think that if he was a party certainly and even a witness certainly, but we are in a gray area as far as someone being affected by it but not technically involved in it, so I don't know how to answer that....

Transcript of Proceedings, June 23, 2010 [Doc. No. 74-6] at 4:4-8.

E. **Defendants' Statement:** "Carolyn Prakel never objected or indicated that an interpreter was needed for those court appearances." Exh. J, Day Aff. [Doc. No. 74-10] ¶ 12. Carolyn Prakel never requested that an interpreter be made available for Mr. Prakel. Exh. J, Day Aff. [Doc. No. 74-10] ¶ 18." Defs.' Br. at p. 4.

**Omission #1:** Prior to the hearings, Day instructed Ms. Prakel not to speak unless specifically directed to do so. Exh. 5, Second Affidavit of Carolyn Prakel at ¶ 12. Neither Day nor the judge gave Ms. Prakel the opportunity to address the court regarding the court's obligation to provide an interpreter for her son.

**Omission #2:** Ms. Prakel repeatedly requested that Day ask the court to provide interpreters for her son to attend the hearings. Exh. 5, Second Affidavit of Carolyn Prakel at ¶¶ 8, 9, 10.[4] To the extent that the Day Affidavit creates an impression that Ms. Prakel never indicated to Day that an interpreter was necessary, such an impression is not only false but also violates attorney-client privilege and should be stricken from the record.

**Omission #3:** Defendants have conceded Mr. Prakel requested interpreters and that interpreters were necessary for Mr. Prakel to understand court proceedings. Defs.' Br. at 3-4; Exh. E, Humphrey Dep. [Doc. No. 74-5] at 33:2-8. Furthermore, neither Day nor the prosecutor represented Mr. Prakel. Decl. of Steven Prakel [Doc. No. 66-3] ¶ 21.

F. **Defendant's Statement:** "While Mr. Prakel was present in the courthouse that day [of the hearing on whether he needed interpreters], he did not appear in the courtroom." Defs.' Br. [Doc. No. 75] at 4.

---

[4] By making this statement, Ms. Prakel does not waive attorney-client privilege. She reveals information about privileged communications between herself and her attorney only to the extent necessary to correct the misleading impression of such communications that Day unethically created without seeking or obtaining a waiver of this privilege.

**Omission #1:** Defendants did not provide an interpreter even for that hearing. When Mr. Prakel arrived at the courthouse that day, he could not find an interpreter. Decl. of Steven Prakel [Doc. No. 66-3] ¶¶ 14-17. After waiting for an interpreter that never arrived, he approached a woman who was working in the courtroom and wrote on a piece of paper to her asking where the interpreter was. *Id.* at ¶ 16. The woman refused to communicate with Mr. Prakel in writing or otherwise. *Id.* Without an interpreter, Mr. Prakel could not communicate with the court and had no way of understanding court proceedings. His absence in the courtroom is the direct result of Defendants' refusal to communicate with him about his request for interpreters, much less provide interpreters for him.

**Omission #2:** The court determined that it preferred that Mr. Prakel not appear in the courtroom for the hearing regarding whether he was entitled to an interpreter. Exh. 2, Defs.' Responses to Steven Prakel's Interrogatories at 6.

G. **Defendants' Statement:** "Day told Judge Humphrey that an interpreter was not necessary because Steven Prakel was not scheduled to be a witness or participate in those proceedings. Exh. J, Day Aff. ¶ 10; Exh. E. Humphrey Dep. pp. 17." Defs.' Br. at p. 4.

**Explanation:** *Ex parte* communications between Day and Judge Humphrey, two employees of Defendants, are self-serving hearsay statements immaterial to the legal issue of whether Defendants had to provide interpreter services for Mr. Prakel. As stated previously, an interpreter was not necessary for the criminal proceedings to go forward. Furthermore, Day did not represent Mr. Prakel and stated in open court that he did not know whether the court was required to provide an interpreter for Mr. Prakel. Transcript of Proceedings, June 23, 2010 [Doc. No. 66-9] at 4:4-8.

H. **Defendants' Statement:** "Carolyn Prakel never objected or indicated that an interpreter was needed for those court appearances." Day Aff., ¶ 12. Carolyn Prakel never requested that an interpreter be made available for Mr. Prakel. Day Aff., ¶ 18." Defs.' Br. at 4.

**Explanation:** Day's affidavit should be stricken to the extent that it implies that Ms. Prakel never asked him about interpreters for her son. Ms. Prakel, *in her private and privileged communications with her criminal attorney*, repeatedly asked if the courts would provide interpreters so that Mr. Prakel could understand the court proceedings. Exh. 5, Second Decl. of Carolyn Prakel, at ¶¶ 8, 9, 10. By implying otherwise, the Day Affidavit breaches attorney-client privilege and so the affidavit should be stricken from the record. Regardless, the content of Ms. Prakel's private conversations with her attorney are irrelevant because Defendants knew that Mr. Prakel had requested interpreters and made the deliberate decision not to provide the necessary interpreters for effective communication.

### III.   ARGUMENT

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  Defendants advance eleven separate legal arguments in an attempt to avoid liability.  Almost without exception, Defendants overlook or ignore binding precedent, explicit regulatory language, or a contemporaneous, official record of events.  The Prakels have organized their brief to respond to each of these arguments in turn to demonstrate why there are no genuine issues of material fact on what is a clear-cut issue: the Prakels were entitled to have the Indiana trial courts provide sign language interpreters so that Mr. Prakel could attend his mother's state court criminal proceeding.

### 1.   Federal Law Unequivocally Establishes the Prakels' Right to Have the Court Provide an Interpreter for Mr. Prakel at Ms. Prakel's Hearings.

Title II of the ADA and section 504 of the Rehabilitation Act unequivocally establish that the Prakels have a right to a sign language interpreter at Defendants expense for Mr. Prakel to attend his mother's proceedings.  Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Title II implementing regulations states: "A public entity *shall take appropriate steps* to ensure that communications with applicants, participants, *members of the public*, and companions with disabilities are as effective as communications with others." *Id*. § 35.160(a)(1) (emphases added).  Such "appropriate steps" include providing auxiliary aids and services, such as sign language interpreters.  *Id.* § 35.104; *id.* § 35.160(b)(1). Public entities may not pass on the burden of providing interpreters to the individuals requesting them.  *Id.* § 35.160(c)(1) ("A public entity shall not require an individual with a disability to

bring another individual to interpret for him or her.").  Section 504 carries an identical requirement for state courts to provide auxiliary aids and services, such as sign language interpreters, to ensure that members of the public can access court proceedings.  *See Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004) (explaining that Title II and section 504 are interpreted in similar fashion).

These laws carry no exceptions based on the importance of the proceedings, nor should the Court read in such an exception.  In *Press-Enterprise Co. v. Superior Court of Cal., County of Riverside*, 478 U.S. 1 (1986), the Supreme Court established that members of the public have a First Amendment right to access state court criminal proceedings, including preliminary hearings.  *See id.*  Given that Title II and section 504 apply broadly to public entities' programs, there is no policy reason to carve out an exception with respect to members of the public who also have a constitutional right to observe court proceedings.

Defendants dispute the law, not the facts. As the law is clearly in the Prakels' favor, the Prakels' motion for partial summary judgment should be granted and the Defendants' motion should be denied.  Defendants' frivolous arguments to the contrary will be addressed in turn.

## 2.  Plaintiffs Have Standing

The Prakels have standing to bring their claims, having suffered injury-in-fact at the hands of Defendants that is capable of being redressed by a favorable decision by this Court.

To satisfy the Article III standing requirement, a plaintiff needs to meet three elements. A plaintiff must demonstrate that (1) he has suffered an injury in fact, (2) a causal connection exists between the injury and the conduct complained of, and (3) a favorable decision would likely redress such injury.  *Id.*  An injury in fact occurs when a concrete and particular legally protected interest is invaded in an actual or imminent fashion.  *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560 (1992) (citations omitted); *Mosier v. Kentucky*, 675 F. Supp. 2d 693, 696 (E.D. Ky. 2009) (holding that a deaf attorney had standing to pursue her ADA and Rehabilitation Act claims in federal court against the state court system).

First, Plaintiffs have suffered injury-in-fact.  Mr. Prakel was denied access to his mother's criminal proceedings solely on the basis of his deafness, because of the lack of sign language interpreters.  As a result, Ms. Prakel was deprived of the emotional support that she would have had if her son had been allowed to participate in court proceedings as a spectator and provide meaningful support thereafter.  The Prakels suffered further injury when they were forced to spend money to hire interpreters for subsequent court appearances.

Second, a causal connection exists between the Prakels' injuries and Defendants' conduct.  Defendants were required to provide the interpreters necessary to enable Mr. Prakel to access his mother's criminal proceedings and refused to do so, both as a result of state policy and as a result of specific acts by the Defendants.  Had the Defendants provided the interpreters or reimbursed Ms. Prakel for her expenses in providing her own interpreters, the Prakels' injuries would have been avoided.

Third, a favorable court judgment will redress the injuries that the Prakels have suffered. The parties dispute whether Defendants should have provided Mr. Prakel with interpreter services.  This Court can resolve that dispute by declaring that Defendants should have provided such interpreter services and awarding reimbursement as an equitable form of relief.  Section 504 and Title II further provide for compensatory damages for intentional violations.

Defendants rely on inapposite case law going to relief that the Prakels do not seek. Defendants cite cases on the availability of injunctive relief, which requires a demonstration of future likelihood of harm.  The Prakels do not seek injunctive relief.  They seek declaratory

relief, equitable relief, and compensatory relief, which only require a showing of past harm.  *See Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005); *Crue v. Aiken*, 370 F.3d 668, 677-78 (7th Cir. 2004) ("When a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive.").

Defendants err in relying on *Brunk v. Utschig*, No. 12-cv-832-WMC, 2012 WL 6586485 (W.D. Wis. Dec. 17, 2012), a case where a hard-of-hearing person filed suit against a bankruptcy judge for not providing auxiliary aids and services during his father's bankruptcy hearing.  That case is readily distinguishable because the plaintiff sought a mistrial.  *Id.* at *2.  In contrast, Mr. Prakel does not challenge the outcome of his mother's criminal proceedings; he challenges Defendants' refusal to provide the necessary interpreter services for him to observe and follow the proceedings.  *Brunk* is further distinguishable because the ADA does not apply to federal courts and the plaintiff had also not told the court what he needed for effective communication; consequently there was no remedy under the statute that the court could award the plaintiff for lack of equal access.  *Id.* at *5-*6.  Here, however, it is undisputed that Mr. Prakel needs interpreter services to follow court proceedings, Defendants are subject to section 504 and Title II, and that these statutes provide for compensatory damages.

The past harms that the Prakels have suffered are real, were caused by Defendants, and are redressable by this Court.  For these reasons, this Court should hold that the Prakels have standing to pursue their claims.

### 3.   Defendants Have No Eleventh Amendment Immunity

Defendants are not entitled to Eleventh Amendment immunity with respect to the Title II claim.[5]  At the outset, Defendants gloss over the fact that the Prakels seek not only compensatory damages but also declaratory and equitable relief.  The Seventh Circuit has held that these two forms of relief are not barred by the Eleventh Amendment.  *Ind. Protection and Advocacy Serv. v. Ind. Family and Soc. Serv. Admin.*, 603 F.3d 365, 374 (7th Cir. 2010) (holding that, pursuant to *Ex Parte Young*, plaintiffs may sue named state officials for declaratory and injunctive relief).

With respect to compensatory damages, the Supreme Court has held that Title II validly abrogates the Eleventh Amendment with respect to court access.  *Tennessee v. Lane*, 541 U.S. 509 (2004).  The *Lane* Court noted that preserving the right of access pursuant to Title II requires accommodations, as the "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion."  *Id.* at 531.  In *Lane* itself, one of the plaintiffs was a courtroom reporter with a disability.  *Lane*, 541 U.S. at 514.  The Supreme Court had already held that Title I of the ADA, which applies to employment, does not validly abrogate sovereign immunity.  *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001).  Thus, the courtroom reporter could not have abrogated sovereign immunity as an employee; she could only do so as a member of the public, just as Mr. Prakel was.

Among the rights that Title II protects is the First Amendment right of access to criminal proceedings by members of the public.  *Lane*, 541 U.S. at 523 (citing *Press-Enterprise Co. v. Superior Court of Cal., County of Riverside*, 478 U.S. 1, 8-15 (1986)).  *Press-Enterprise*

--------------------------------------------------

[5] Defendants do not claim Eleventh Amendment immunity with respect to Plaintiffs' section 504 claim, nor could they given clear precedent that "states have waived their immunity as a condition of receiving federal funds." *Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 872 (7th Cir. 2013) (citing *Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000)).

specifically recognized a First Amendment right by members of the public to attend preliminary hearings such as those hearings for which the Prakels requested interpreter services.  478 U.S. at 10.

 *Lane* unequivocally establishes the right of individuals with a disability to sue states for compensatory damages as a result of unequal access to the courts, including criminal proceedings and preliminary hearings.  Given the clearly established Supreme Court precedent, this Court should reject Defendants' assertion of Eleventh Amendment immunity.

### 4. The Judges Are Not Entitled to Judicial Immunity in Their Capacities as Court Administrators

 The judges are not entitled to judicial immunity for the simple reason that they have been sued in their *official capacities* only and only officers sued in their *individual capacities* may assert this defense.  The Supreme Court has explained that "[t]he only immunities that can be claimed in an official-capacity action are forms sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."  *Kentucky v. Graham*, 473 U.S. 159, 167 (1985).  The Seventh Circuit has explained that immunities such as judicial immunity "are personal defenses designed to protect the finances of public officials whose salaries do not compensate them for the risks of liability."  *Capra v. Cook Cty. Bd. of Review*, 733 F.3d 705, 711 (7th Cir. 2013) (quotation marks omitted).  The agencies that the judges work for may not assert these personal-liability defenses.  *See, e.g.*, *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004) (holding that a municipality may not assert judicial immunity because only officers sued in their individual capacities can assert such defenses); *Devito v. Chi. Park Dist.*, 83 F.3d 878, 881 (7th Cir. 1996) ("The only immunities available in an official capacity suit are those that may be asserted by the governmental entity itself (e.g., Eleventh Amendment immunity or sovereign immunity).").

Even if judges sued in their *official capacities* could assert judicial immunity, this defense would still fail.  Judicial immunity is not as "far-sweeping" as Defendants claim. In the first instance, judicial immunity only applies to suits for money damages.  *Lowe v. Letsinger*, 772 F.2d 308, 311-312 (7th Cir. 1985).  The Prakels assert claims for declaratory and equitable relief (i.e., reimbursement of expenses), in addition to compensatory relief.  Thus, even if judicial immunity applied, it would shield the judges only from the claim for compensatory relief, and not from their obligation (through their employers) to reimburse the Prakels for the money spent or from declaratory relief.

Moreover, the Supreme Court has held that judicial decisions that have no bearing on the traditional judicial role of assessing the merits of a case, such as personnel decisions, are not judicial acts.  *Forrester v. White*, 484 U.S. 219 (1988).[6]  In *Forrester*, a parole officer sued a judge for demoting and later firing her in violation of Title VII of the Civil Rights Act.  *Id.* at 220-21.  Noting that the judge had the discretion to hire, demote, and fire his parole officers, the Supreme Court nonetheless found that judicial immunity did not shield judges from the personal-liability consequences of doing so in violation of the officer's federally protected rights.  *Id.* at 227-29.  The Court reasoned:

> [W]e think it clear that Judge White was acting in an administrative capacity when he demoted and discharged Forrester.  Those acts – like many others involved in supervising court employees and overseeing the efficient operation of a court – may have been quite important in providing the necessary conditions of a sound adjudicative system.  The decisions at issue, however, were not themselves judicial or adjudicative.  As Judge Posner pointed out below, a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such employment decisions.  Such decisions, like personnel decisions made by judges, are often

---

[6] Although *Forrester* has been superseded by statute in part, the superseding statute applies only to injunctive relief. *Leclerc v. Webb*, 270 F. Supp. 2d 779, 792-793 (E.D. La. 2003).

> crucial to the efficient operation of public institutions (some of which are at least
> as important as the courts), yet no one suggests that they give rise to absolute
> immunity from liability ….

*Id.* at 229 (emphasis added).

*Forrester* is directly analogous to the case at bar.  Hiring an interpreter is very much like an employment decision or any other decision regarding the "efficient operation of the court." As the Defendant notes, the Indiana Trial Rules authorize each trial judge to "appoint an interpreter of its own selection" and "fix his reasonable compensation."  Ind. R. Trial P. 43(C). In other courts, however, an ADA coordinator or court administrator handles requests for interpreting services.  *See, e.g.*, *Duvall v. County of Kitsap*, 260 F.3d 1124, 1130-31 (9th Cir. 2001) (holding that an ADA coordinator was not entitled to quasi-judicial immunity for denying a party's request for auxiliary aids and services).  Thus, a judge who declines to hire an interpreter "cannot meaningfully be distinguished" from an official presiding over any other public hearing, such as a town hall meeting, declining to hire an interpreter for that venue.  As Defendants argued, hiring or not hiring an interpreter for a spectator has no bearing on the timing of the case, the evidence introduced, or the judge's freedom to rule as he sees fit.  Defs.' Br. [Doc. No. 75] at 35. Thus, a judge's refusal to provide interpreters for a spectator is not protected by judicial immunity.

Precedent from other courts supports this position.  Defendants misconstrue *Duvall*. The *Duvall* court held that the court's ADA coordinator, who had made the decision not to provide the accommodations the plaintiff had requested, was not entitled to quasi-judicial immunity for this ministerial act.  260 F.3d at 1134-35.  Although the court held that the judge was immune, it so held only after noting that the judge had not played a direct role in the handling of the accommodations request.  Here, by contrast, the Judicial Defendants each played a direct role in

the denial of interpreting services, as Mr. Prakel contacted each judge or chambers directly. Decl. of Steven Prakel [Doc. No. 66-3]; Cleary Dep. [Doc. No. 66-6] at 13, 15, 24; Humphrey Dep. [Doc. No. 66-8] at 14, 15, 19. That this act, customarily performed by an administrator, happened to have been done by judges in this instance does not transform this ministerial act into a judicial one.

Defendant further errs in relying on *Rafford v. Snohomish County*, Case No. C07-0947RSL, 2008 U.S. Dist. LEXIS 8656 (W.D. Wash. Feb. 5, 2008). The *Rafford* court held that judicial immunity was not available with respect to the plaintiff's claims for declaratory and injunctive relief. *Id.* at *4. And because the plaintiff did not contest the issue of judicial immunity with respect to damages, the court did not visit that issue. *Id.*

For these reasons, this Court should reject Defendants' attempt to use judicial immunity to shield violations of section 504 and Title II.

**5. The Division is Not Entitled To Judicial or Quasi-Judicial Immunity**

The Division is not entitled to judicial or quasi-judicial immunity for the same reason that judges sued in their official capacities are not entitled to judicial immunity: the Supreme Court has held that such immunity may be asserted only by *officers sued in their individual capacities*: the defense is not available to officers sued in their official capacities, much less the agencies that employ them. *Graham*, 473 U.S. at 167; *see also Capra*, 733 F.3d at 711 & n.4 (collecting cases holding that only officers sued in their *individual* capacity can assert quasi-judicial immunity); *VanHorn v. Oelschlager*, 502 F.3d 775, 778-79 (8th Cir. 2007) (collecting circuit court cases). The case that Defendants rely on, *Snyder v. Nolen*, analyzed whether an officer sued in his *individual capacity* may claim quasi-judicial immunity. 380 F.3d 279, 283 (7th Cir. 2004). Since the Division is an *agency*, it may not assert quasi-judicial immunity.

Even if the Division could somehow assert quasi-judicial immunity, the defense would still fail. "Absolute immunity does not extend to all positions simply 'because they are part of the judicial function.'" *Id.* at 286. Rather, "[a]bsolute immunity for acts by nonjudicial government officers is determined on the basis of 'a functional approach.'" *Dawson v. Newman*, 419 F.3d 656, 662 (7th Cir. 2005) (quotation marks omitted). Seventh Circuit precedent makes clear that individuals can assert quasi-judicial immunity only if they act in a judicial capacity or carry out judicial functions at the behest of judicial officers acting in a judicial capacity. *Snyder*, 380 F.3d at 286-87. For the reasons described in the previous section, the decision whether to provide interpreter services is an administrative personnel decision that is not a judicial act protected by judicial immunity. *Forrester*, 484 U.S. at 229; *see also Duvall*, 260 F.3d at 1134-35 (denying quasi-judicial immunity for a court administrator who refused to provide captioning services for a hard-of-hearing litigant). Since the judges have no judicial immunity with respect to ensuring court access, subordinates have no quasi-judicial immunity either. *See Snyder*, 380 F.3d at 286-87.

For the foregoing reasons, this Court should reject the Division's attempt to assert quasi-judicial immunity to shield its violations of section 504 and Title II.

### 6.   The State, the Division, and the Chief Justice Are Proper Defendants

The State, the Division, and the Chief Justice each are proper defendants in this case. First, as explained at length in Part II.1, the State, the Division, and the Chief Justice work in concert with the trial courts, making them proper defendants. In addition, Seventh Circuit precedent clearly establishes that Indiana superior and county judges are state officials and that Indiana trial courts are units of the State judicial system. Further, Title II charges public entities, such as the State, the Division, and the Chief Justice, with a duty to take steps to ensure equal

18

access for people with disabilities. Finally, the Division and the Chief Justice each played a direct role in the case.

### a. The Seventh Circuit Has Established That County Judges are State Judicial Officials

Defendants concede that the trial courts are state entities. Defs.' Br. [Doc. No. 75] at 6, 10; Defendants' Amended Responses to Plaintiff's Request for Admissions [Doc. No. 66-14] at Admissions Nos. 18, 19. The Seventh Circuit has also so held. In *Kelly v. Munic. Cts. of Marion Cnty, Ind.*, 97 F.3d 902, 908 (7th Cir. 1996), the Seventh Circuit held that, according to Indiana law, county courts are "unit[s] of the judicial branch of the State of Indiana" and that judges of such courts are "state officer[s]." *Id.* at 908. Similarly, in *Woods v. City of Michigan City, Ind.*, 940 F.2d 275 (7th Cir. 1991), the Seventh Circuit held that "judges of Indiana's circuit, superior and county courts are judicial officers of the State judicial system." *Id.* at 279. This clear Seventh Circuit precedent renders immaterial Defendants' arguments that the State is not liable to the Prakels when the State's courts were the entities that discriminated against the Prakels. Further, for the reasons outlined in Part II.1, the State, Division, and Chief Justice work in concert with the trial courts regarding policies and practices for providing interpreters in trial courts.

### b. Title II Imposes a Duty to Act

Congress "intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability." *Delano-Pyle v. Victoria Cnty., TExh.*, 302 F.3d 567, 575 (5th Cir. 2002). A Department of Justice regulation enforcing Title II of the ADA expressly require public entities to take steps to ensure that spectators have access to preliminary hearings. 28 C.F.R. § 35.160(a)(1) ("A public entity *shall take appropriate steps* to

ensure that communications with applicants, participants, *members of the public*, and *companions with disabilities* are as effective as communications with others.") (emphases added).  This duty includes providing auxiliary aids and services to spectators. 28 C.F.R. § 35.160(b)(1) ("A public entity *shall furnish* appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, *companions, and members of the public*, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.") (emphases added).

Rather than take steps to ensure that spectators with disabilities have equal access criminal proceedings, the State, Division, and Chief Justice have repeatedly denied such access. In their Interrogatories, the Defendants, including the State Defendants, unequivocally stated, "Provision of sign language interpretation services cannot be provided to incidental spectators at relatively perfunctory proceedings such as those conducted at the bench or without much, if any, testimony, for both practical and budgetary reasons."  Exh. 2, Defs' Response to Steven Prakel's Interrogatory No. 7.  Defendants further specified that interpreters were not provided to Mr. Prakel because the proceedings "did not warrant sign language services for a non-party, non-witness, or someone who would not be materially affected by the hearing."  Id., at Response No. 10.  In answer to Interrogatory Number 4 of Steven Prakel's First Interrogatories to Defendants, the Defendants conceded that the Supreme Court is responsible for trial rules that resulted in Mr. Prakel being denied access to the courts as a spectator and the reason the State/Supreme Court/Division of State Court Administration is a necessary defendant.  *Id.* at 3.

In the course of arguing that neither the State nor the Division are proper parties, Defendants imply that the Prakels should have sued Dearborn County and that it is the county that must pay the damages; however, the state judiciary pays the judges and sets the policies that

the county courts follow.  Further, the judges have been sued in their *official capacities* and whatever agencies they acted on behalf of are in this suit through the judges' appearances in this case as defendants sued in their official capacity.  *Graham*, 473 U.S. at 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  This lawsuit has been pending more than two years, and the judges' employers – whether the state or the county or both – have had ample opportunity to defend themselves in this lawsuit, and chose to do so through the state attorney general's office.[7]  They may fairly be held accountable in this lawsuit for their judicial employees' actions through the principle of *respondeat superior* liability.  *Cf.*, *Delano-Pyle v. Victoria Cnty., TExh.*, 302 F.3d 567, 574-75 (5th Cir. 2002) ("The Fourth, Seventh, Ninth, and Eleventh circuits have all agreed that when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees as specifically provided by the ADA."); *Walker v. Marion County Sheriff's Dep't*, No. 96-4177, 1997 U.S. App. LEXIS 35315, at *7-*8 (7th Cir. Dec. 11, 1997).

Moreover, the State and the Division have a direct role in the provision of interpreters within the court system.  The State, Division, and Supreme Court fund the provision of language

---

[7] In a recent edition of Court Times, the Division counseled the trial court judges what to do if they received a discrimination complaint.  Such instruction included advising the trial court judges to immediately contact the Division and let the Division determine whether representation in the matter properly rests with the Attorney General's office, as was apparently decided here, or with some other entity. This article was written by the very individual whom Judge Humphrey allegedly contacted for advice in responding to the Prakels' requests.  Exh. 6, Brenda Rodeheffer, "When the Honorable Judge Has Been Served…Send it to Me," Indiana Court Times, July 3, 2013.

services in all trial courts in the State of Indiana, through provision of a Language Line and Language Line grants.  Letter from Lilia Judson/Division of State Court Administration to the United States Department of Justice, September 4, 2009 [Doc. No. 66-15] at 2; Humphrey Dep. [Doc. No. 66-8] at 27:11-17; 28:8-20; Remondini Dep. [Doc. No. 66-10] at 15:20-17:16; 19:11-13.  The Language Line provides access to interpreters in more than 200 languages, but sign language is not one of the languages provided.  *Id*.  Indeed, the State, Division, and Supreme Court provided Language Line grant funding to the Dearborn courts and this funding has been used to provide sign language interpreters for litigants in the trial court.  Exh. 4, Responsive Doc. No. 4, Defs.' Response to Steven Prakel's Request for Production at 1-2.

Further, a 2009 letter from the Division to the U.S. Department of Justice spells out the steps that the Division (along with the State and Indiana Supreme Court) is capable of taking to ensure interpreters are provided. In this letter, the Division explained the statewide procedures that Defendants employ to ensure that the court system is accessible to people who do not speak English.  It stated: "Please be assured that the Indiana Supreme Court and its divisions, as recipients of federal financial assistance from the Department of Justice (DOJ), are mindful of the Court's obligation under Title VI to provide limited-English-proficient (LEP) individuals with meaningful access to Indiana's courts."  Letter from Lilia Judson/Division of State Court Administration to the United States Department of Justice, September 4, 2009, at 1.  In this letter, the Division described, *inter alia*, convening a Court Interpreter Advisory Committee which advises the Court on court interpretation services.  That advisory committee proposed and the Court adopted a Code of Ethics for Court Interpreters.  *Id.* at 1-2.  This letter demonstrates that the State as a whole maintains oversight and responsibility for ensuring that the courts are accessible.

22

*c.  The Division and Chief Justice Played a Direct Role in this Case*

Finally, both the Division and the Chief Justice played a direct role in this case.  Judge Humphrey twice consulted the Division with respect to providing interpreters for Mr. Prakel and reimbursing Ms. Prakel for her expenses.  Although the Division refused to discuss the content of these calls in deposition, the Division admits that the calls occurred and that Judge Humphrey subsequently denied Mr. Prakel's request for an interpreter and Ms. Prakel's request for reimbursement.  The Chief Justice received the letter from the National Association of the Deaf, alerting him to the county judges' refusal to provide interpreters and requesting reimbursement.  The Chief Justice's failure to respond to this letter constitutes another failure on the part of the Indiana judicial system to take the legally required steps to ensure equal access for people with disabilities.

For the reasons stated above, the State, Division, and Chief Justice are each proper defendants, as a matter of law, as a consequence of the improper policies they created, and as a result of their direct involvement in this case.

**7.  Ms. Prakel Has Consistently Requested an Interpreter for Her Son**

Defendants argue that Ms. Prakel waived her claims through her counsel, Day, by failing to interrupt the proceedings and object when he suggested that the proceedings may continue without an interpreter.  However, as explained in Part II.2, the trial transcript reflects that Day never waived Ms. Prakel's right to have her son be provided with an interpreter to attend and understand the proceedings.  When asked by Judge Cleary whether an interpreter was necessary to the proceedings, Day informed the court that an interpreter was not necessary for the proceedings to go forward because Mr. Prakel was not a witness.  When Judge Cleary pressed further, asking if the court had an obligation to provide an interpreter for Mr. Prakel as a

spectator, Day answered, "I just don't know."  Transcript of Proceedings, June 23, 2010 [Doc. No. 74-6] at 4:4-8.

Defendants rely on *Tucker v. Hardin Cnty.*, 448 F. Supp. 2d 901 (W.D. Tenn. 2006), *aff'd sub nom. Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008).  However, in that case, the state court offered the deaf defendant the option of continuing the hearing until an interpreter was available or proceeding as scheduled, but without interpreter.  When faced with that choice, the deaf defendant made the knowing and voluntary decision to prioritize speed over communication and chose to proceed with the hearing without an interpreter.  539 F.3d at 541-42.  Here, by contrast, the state court made a determination on the record that no interpreter would be provided and gave Ms. Prakel no opportunity to continue the hearing so that an interpreter could be obtained for her son.

Given that the Prakels took immediate corrective action afterwards by obtaining interpreters for the hearings that followed, there was no ratification of the state court's misconduct or any alleged waiver made by Day.  Thus, Ms. Prakel never waived her right for her son to have an interpreter.

Importantly, Defendants do not – and cannot – assert that Day's alleged waiver of Ms. Prakel's rights extends to Mr. Prakel's rights.  Day did not represent Mr. Prakel.  While Mr. Prakel took every opportunity to inform court clerks and others of his need for interpreters, he had no opportunity to assert these rights in open court, as he had no way of participating in the proceedings.

### 8.  Defendants May Not Use Judicial Estoppel To Shield Misconduct

Defendants err in asserting judicial estoppel on the basis of Day's statements to the state court.  As described above, the Prakels repeatedly requested that the state court provide

interpreter services for Mr. Prakel, and Day himself said he did not know what the law required with regard to Mr. Prakel, who was not his client.  Ms. Prakel did not ratify any such statements and the Prakels took immediate corrective action by arranging for interpreters for the hearings that followed.  The Prakels are not to blame for the Defendants' misconduct.

In addition to distorting the record, Defendants misapply the doctrine of judicial estoppel. Federal law governs the application of judicial estoppel in cases litigated in federal court. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 603 (9th Cir. 1996).  Judicial estoppel is an equitable doctrine and operates "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).  A court has the discretion to apply judicial estoppel to a plaintiff's claims when "(1) the later position is clearly inconsistent with the earlier position; (2) the facts at issue are the same in both cases; (3) the party to be estopped convinced the first court to adopt its position; and (4) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *United States v. Christian*, 342 F.3d 744, 747 (7th Cir. 2003) (citing New Hampshire, 532 U.S. at 750).  In the Seventh Circuit, intentional wrongdoing is the focus of judicial estoppel.  *Chaveriate v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (collecting cases).

For judicial estoppel to apply, the later position must be "clearly inconsistent" with the first position and the party must have "convinced" the court to adopt that position.  *Christian*, 342 F.3d at 747.  There can be no inconsistency because Day told the state court that *he did not know* whether Mr. Prakel had a right to interpreters as a spectator.  Day's only position on the law's requirements was to contact the Judicial Commission "or someone" who might know the

answer.  Transcript of Proceedings, June 23, 2010 [Doc. No. 74-6] at 4.  Since Day did not know what the law required, he could hardly have "convinced" the state court one way or another on this issue.

Given that the state court had made up its mind that it would not provide interpreters, the application of judicial estoppel would not balance equities but rather cement the harm that Defendants inflicted on the Prakels.  Ms. Prakel gained no advantage when the state courts refused to provide interpreters; in fact, the Prakels suffered real harm when Mr. Prakel was excluded from proceedings due to the lack of interpreters and when the Prakels were forced to arrange and pay for interpreter services to ensure that Mr. Prakel had access to subsequent proceedings.  In light of the state court's determined refusal to provide interpreters, any intentional wrongdoing was by the Defendants and not by Ms. Prakel.  Ms. Prakel in no way benefited from the state court's refusal to provide interpreter services for her son.  This Court should reject Defendants' attempt to use judicial estoppel as a shield for its misconduct when the Prakels have consistently requested that the state courts provide interpreter services.

### 9.  Title II Requires Defendants To Provide Auxiliary Aids and Services Necessary To Ensure Effective Communication

Title II unequivocally establishes that deaf members of the public have a right to have courts provide the sign language interpreters necessary to understand criminal proceedings as spectators.  In arguing otherwise, Defendants ignore the considerable case law specifically holding that court hearings are covered by Title II.  *E.g.*, *Tennessee v. Lane*, 541 U.S. at 540-41 (holding that Title II validly abrogates sovereign immunity with respect to courtroom proceedings); *Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) (explaining that Title II covers "anything a public entity does"); *Shotz v. Cates,* 256 F.3d 1077, 1080 (11th Cir. 2001) ("A trial undoubtedly is a service, program, or activity."); *Mosier v.*

*Kentucky*, 640 F. Supp. 2d 875, 879 (2009) ("[T] the phrase 'services, programs or activities' encompasses virtually everything that a public entity does.") (quotation marks omitted)); *Rafford*, 2008 U.S. Dist. LEXIS 8656, at *6-*8.

Defendants also disregard Supreme Court precedent recognizing a constitutional right for members of the public to access criminal proceedings. *Lane*, 541 U.S. at 523 ("[W]e have recognized that members of the public have a right of access to criminal proceedings secured by the First Amendment."). Defendants also disregard regulatory language expressly establishing that members of the public and companions with disabilities have a right to sign language interpreters when required for them to receive equal access to these programs, services, and activities. 28 C.F.R. § 35.160(b)(1) ("A public entity *shall furnish appropriate auxiliary aids and services* where necessary to afford individuals with disabilities, including applicants, participants, *companions*, and *members of the public*, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.") (emphases added).

Defendants next err in arguing that because Title II does not require public entities to provide "personal devices" such as wheelchairs, Defendants do not have to provide interpreters. Defendants' interpretation would read out of the ADA any requirement to provide interpreter services for deaf and hard of hearing individuals, defeating the purpose of the statute to ensure equal access for such individuals. Defendants arrived at this error by overlooking the fact that interpreters are not "personal devices" but rather are "auxiliary aids and services" that Title II requires public entities to provide when necessary to ensure effective communication with individuals who are deaf or hard of hearing. The Department of Justice's definition of auxiliary aids begins: "Auxiliary aids and services includes—(1) Qualified interpreters..."). 28 C.F.R. § 35.104. Taking Defendants' argument at face value would mean that Defendants would not have

to provide interpreters for litigants either, an illogical result.  Consequently, there can be no dispute that Defendants are required to provide such services for Mr. Prakel who needs interpreters to follow court proceedings.

Defendants' reliance on *Memmer v Marin Cnty. Courts*, 169 F.3d 630 (9th Cir. 1999), is groundless.  In that case, the district court held that a reader for the blind could not assert a Title II claim.  *See id.* at 632.  A reader for the blind has no right to be hired to provide services for an individual with a disability; public entities may choose what auxiliary aids and services to provide as long as the result is equal access.  *Dobard v. San Francisco Bay Area Rapid Transport*, No. C-92-3563-DLJ, 1993 U.S. Dist. LEXIS 13677 at *9-*10 (N.D. Cal. Sept. 7, 1993).  Further, the visually impaired litigant failed to demonstrate that she did not have equal access to the court system.  169 F.3d at 633.  Here, by contrast, there is no dispute that Mr. Prakel needs interpreter services to follow court proceedings.

Perhaps in an attempt to evade the foregoing authority, Defendants err in casting this case as a "disparate impact" case, citing *Alexander v. Choate*, a case that addressed the impact of the length of Medicaid coverage on individuals with a disability.  469 U.S. 287 (1985).  This is not a disparate impact case but rather a case about Defendants' failure to comply with its affirmative obligations to provide necessary auxiliary aids and services that Title II requires public entities to provide to ensure effective communication with individuals who are deaf or hard of hearing such as Mr. Prakel.  28 C.F.R. § 35.160.

The affirmative defenses available for Title II violations are two: fundamental alteration and undue burden.  This Court has held that Defendants are not entitled to assert fundamental alteration or undue burden in this case.  Order on Plaintiff's Motion to Strike Defendants' Responses [Doc. No. 55] at 3; Order on Plaintiffs' Motion to Compel [Doc. No. 49] at 4.

28

Defendants admit in their briefing that they are not asserting undue burden because the cost of providing interpreter services was negligible to them. Defs.' Br. [Doc. No. 75] at 26. Yet, they attempt to reassert both undue burden and fundamental alteration in contradiction to the law of this case based on a hypothetical situation in which deaf individuals other than Mr. Prakel repeatedly secure interpreters to watch criminal proceedings other than Ms. Prakel's and require to court to spend more than $264 providing these services. Those facts are not before this Court and cannot form a basis for a defense.

Because Title II unequivocally entitles deaf spectators to sign language interpreters at preliminary state court criminal proceedings, this Court should deny Defendants' motion for summary judgment.

### 10. Section 504 Requires Defendants To Provide Necessary Auxiliary Aids and Services To Ensure Effective Communication

Section 504 likewise requires Defendants to provide sign language interpreters for Mr. Prakel. Defendants admit that they are recipients of federal financial assistance subject to section 504. Defs.' Response to Motion to Compel [Doc. No. 50] at 1-2. Defendants do not dispute that the statute requires recipients of federal financial assistance to provide auxiliary aids and services such as interpreters when necessary to ensure effective communication. Thus, they do not dispute any of the facts material to this claim.

Defendants suggest that section 504 requires a "balancing of interests," citing *Alexander v. Choate*, 469 U.S. 287 (1985). However, *Choate* is a disparate impact case that did not address auxiliary aids and services. Section 504, like Title II, places the affirmative obligation on recipients such as Defendants to provide auxiliary aids and services necessary to ensure effective communication with individuals who are deaf or hard of hearing. *E.g.*, *Chisolm v. McManimon*, 275 F.3d 315, 324 & n.9 (3d Cir. 2001).

29

Rather than acknowledge that section 504 requires Defendants to provide necessary interpreter services for deaf individuals, including members of the public, Defendants rely on a policy adopted by the Administrative Office of the United States Courts for federal courts that has no application to state courts.  However, as Defendants themselves acknowledge, "[f]ederal courts are not subject to the ADA or the Federal Rehabilitation Act."  Defs.' Br. [Doc. No. 75] at 2; *see also Patrick v. United States Postal Serv.*, No. CV-10-0650-PHX-ECV, 2010 U.S. Dist. LEXIS 1282677, at *4-*8 (D. Ariz. Nov. 23, 2010) (holding that neither section 504 nor Title II applies to the federal courts).  Moreover, Defendants attempt to read meaning into this policy's failure to mention spectators or preliminary hearings where Title II and section 504 expressly create a right of members of the public and companions with disabilities to be provided with auxiliary aids and services to attend preliminary state court criminal proceedings.  *See* 28 C.F.R. § 35.160(a), (b); *Lane*, 541 U.S. at 523 (citing *Press-Enterprise*, 478 U.S. at 8-15).  These statutes provide broader protections than the federal court's policy; as described above, the statutory, regulatory, and case law guidance makes clear that these statutes require Defendants to provide interpreter services for deaf spectators.

Since Defendants are subject to section 504, they must provide the auxiliary aids and services necessary to make court proceedings accessible to Mr. Prakel.  Since it is undisputed that interpreter services are necessary for Mr. Prakel and that Defendants refused to provide such auxiliary aids and services, this Court should grant summary judgment for Plaintiffs on the section 504 claim.

### 11. Defendants Intentionally Discriminated Against the Prakels

In the context of section 504 and Title II, courts of appeal have uniformly held that deliberate indifference "does not require a showing of personal ill will or animosity toward the

30

disabled person." *E.g.*, *Meagley v. City of Little Rock*, 639 F.3d 384, 389 & n.4 (8th Cir. 2011) (collecting cases). This Court recognized that no such showing is required, instead holding that "[t]o prove intentional discrimination, Plaintiffs must show that the Dearborn Court Judges: knew the Title II and section 504 requirements and that they applied to their courts; were on notice of Plaintiffs' requests; and intentionally provided lesser accommodation than the law requires." Entry on Defs.' Mot. for Protective Order [Doc. No. 57] at 9 (citing *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829 (D. Md. 1998)).

Despite citing a litany of ADA and section 504 cases consistent with the Court's description of the elements of intentional discrimination, Defendants inexplicably pull from an Eighth Amendment case to add a requirement that Defendants act "with a sufficiently culpable state of mind." Defs.' Br. at 30 (citing *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). As this Court has already recognized, however, deliberate indifference has a different meaning in the disability context. Far from requiring that Defendants engage in the "cruel and unusual" acts proscribed by the Eighth Amendment, "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect." *Choate*, 469 U.S. at 295. As this Court explained, "[t]o prove intentional discrimination, Plaintiffs must show that the Dearborn Court Judges: knew the Title II and section 504 requirements and that they applied to their courts; were on notice of Plaintiffs' requests; and intentionally provided lesser accommodation than the law requires." Entry on Defs.' Mot. for Protective Order [Doc. No. 57] at 9.

In this instance, it is undisputed that the Prakels made numerous requests that Defendants provide interpreter services, that Defendants admit that they are subject to Title II and section 504, were aware of the Prakels' requests, and intentionally opted not to provide interpreter

services (or for the matter any other auxiliary aid or service) and refused to reimburse after explicit notification of legal obligation.  Defendants' conscious decision to refuse interpreters and to deny reimbursement despite the Prakels' repeated requests for interpreter services is deliberate indifference to Mr. Prakel's right to interpreter services to understand court proceedings that are open to members of the public as a matter of constitutional right.

In every case the Defendants cite to set limits on the availability of intent, the defendants had made concerted attempts to remedy the situation after being informed of the legal violation. In *Rafford*, the judge ordered court personnel to make considerable efforts to fix the plaintiff's assistive listening device when informed that it did not work properly.  *See Rafford*, 2008 U.S. Dist. LEXIS 8656 at *13.  Likewise, in *Meagley v. City of Little Rock*, the defendants took immediate corrective action after being informed that a bridge was too steep to allow for wheelchair access. 639 F.3d at 389.  By contrast, Defendants made the deliberate decision not to provide interpreter services for Mr. Prakel even though they knew that interpreter services were necessary for effective communication.

There are no genuine issues of material fact whether Defendants knew that the federal laws in question applied to them and of Mr. Prakel's need for interpreter services to understand court proceedings.  Accordingly, this Court should hold that Defendants intentionally discriminated against the Prakels when they made the conscious decision not to provide interpreter services and not to reimburse for the Prakels' provision of interpreter services, a deliberate choice that resulted in ineffective communication and considerable emotional harm and frustration for the Prakels.

**12. Carolyn Prakel has Standing to Bring Her Own Claims as an Associated Individual.**

Defendants confuse associational claims with third-party standing.  Third-party standing occurs when a party brings claims in the stead of another party that has been injured.  *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000).  Conversely, a person without a disability may bring an independent claim based on her association with a person with a disability if the discrimination occurred because of that association.  *E.g.*, *Baaske v. City of Rolling Meadows*, 191 F. Supp. 2d 1009, 1015-1016 (N.D. Ill. 2002) (citing *Micek v. City of Chicago*, 1999 U.S. Dist. LEXIS 16263, No. 98 C 6757, 1999 WL 966970, at *12 (N.D. Ill. Sept. 30, 1999) ("The ADA allows non-disabled individuals to bring claims of discrimination based on their association with disabled individuals.").  Ms. Prakel has a claim for her own injuries, which include emotional harm from not being able to receive her son's support when there were no interpreter services and from having to pay for interpreter services so that her son could follow subsequent proceedings.

The regulations implementing Title II of the ADA provide: "A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."  28 C.F.R. § 35.130(g).  The Technical Assistance Manual further provides that the prohibition on discrimination covers any type of association or relationship between the individual or entity that is discriminated against and the individual or individuals with disabilities, if the discrimination is actually based on disability.  TA Manual ss II-3.9000, *available at* http://www.ada.gov/taman2.html (last visited Dec. 22, 2013).

Like Title II, section 504 also prohibits discrimination based on disability, and allows assertion of a claim by any aggrieved party regardless of whether the person being injured is

33

disabled or not.  *See, e.g.*, *Barker v. Riverside County Office of Educ.*, 584 F.3d 821, 825-26 (9th Cir. 2009).  Consequently, courts have long recognized associational claims filed finding that individuals without disabilities have associational standing pursuant to Title II and Section 504. *See, e.g.*, *Doe v. County of Ctr.*, 242 F.3d 437, 447 (3rd Cir. 2001); *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 47-48 (2d Cir. 1997) (affirming grant of preliminary injunction to an alcohol and drug treatment center that was denied a zoning permit due to association with individuals with a disability); *Majocha v. Turner*, 166 F. Supp. 2d 316, 324 (W.D. Pa. 2001) (holding that a hearing wife whose son was denied an appointment with a doctor's office because the child's father was deaf could assert a claim for discrimination based on association with an individual with a disability).

Defendants err in relying on *Tucker v. Tennessee*, a case where a deaf mother voluntarily interpreted for her deaf sons' criminal proceedings.  539 F.3d 526, 533-34 (6th Cir. 2013).  The court held that the deaf mother had no claim because she agreed to interpret for her sons even though she did not have to.  *Id.*  That case is readily distinguishable in that the Prakels hired a qualified interpreter after Defendants left them with no other option that would enable Mr. Prakel to attend the proceedings.  Ms. Prakel is not suing as an individual with a disability but rather is suing for associational discrimination because she was forced to pay for interpreter services when the state court would not.

Since Ms. Prakel was harmed because she was forced to expend funds to ensure that her deaf son could attend the proceedings and provide emotional support, she is an individual protected by the statute.

## CONCLUSION

With no material facts in dispute, the Court should enter summary judgment as to liability in favor of the Prakels and allow the claims for compensatory damages to proceed to the jury. The claim for reimbursement, equitable relief, and declaratory judgment, should issue from this Court.

Respectfully submitted,

/s/ Mary C. Vargas
Mary Vargas
Michael Stein
Stein & Vargas, LLP
5100 Buckeystown Pike
Suite 250
Frederick, MD 21704
Tel: (240) 793-3185
Fax: (888) 778-4620
Mary.Vargas@steinvargas.com
Michael.Stein@steinvargas.com

Matthew Lorch
Lorch Law Office LLC
223 E. Spring Street
New Albany, IN 47150
Tel: (812) 949-2111
Fax: (502) 805-0482
Matthew@lorchlaw.com

Debra Patkin
National Association of the Deaf
Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Tel: (301) 587-1788
Fax: (301) 587-1791
debra.patkin@nad.org

Counsel for Plaintiffs[8]

---

[8] Counsel for the Plaintiffs thank National Association of the Deaf law interns, Caleb Karpay and Allan Thorson, for their contributions to this brief.

35

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Mary C. Vargas