UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| STEVEN PRAKEL,<br>CAROLYN PRAKEL,<br><br>               Plaintiffs,<br><br>     vs.<br><br>STATE OF INDIANA,<br>INDIANA SUPREME COURT Division of<br>State Court Administration,<br>KIMBERLY A. SCHMALTZ Magistrate<br>Judge,<br>JAMES D. HUMPHREY Judge,<br>JONATHAN N. CLEARY,<br>LORETTA H. RUSH Chief Justice,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)     4:12-cv-00045-SEB-WGH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER ON PENDING MOTIONS**

This cause is now before the Court on cross-motions for summary judgment filed

by Plaintiffs [Docket No. 64] and Defendants [Docket No. 73] on October 9, 2013 and

November 22, 2013, respectively. Plaintiffs Steven Prakel and Carolyn Prakel have

brought this claim against Defendants State of Indiana; Indiana Supreme Court, Division

of State Court Administration; Magistrate Judge Kimberly A. Schmaltz; Judge James D.

Humphrey; Judge Jonathan N. Cleary; and Chief Justice of the Indiana Supreme Court

Loretta H. Rush, alleging that Defendants denied the Prakels equal access to the courts by

failing to provide Mr. Prakel, who was a spectator at the proceedings and is deaf, the

services of an interpreter at various court proceedings in which his mother, Ms. Prakel,

1

was a criminal defendant, in violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. For the reasons detailed below, we <u>DENY</u> Plaintiffs' Motion for Summary Judgment and <u>GRANT IN PART</u> and <u>DENY IN PART</u> Defendants' Motion for Summary Judgment.

## **Factual Background**

### **The Parties**

Mr. Prakel is an adult deaf individual whose primary mode of communication is American Sign Language. He requires a qualified sign language interpreter in order to access spoken communications. S. Prakel Decl. ¶¶ 5-6. Mr. Prakel attended the National Technical Institute of the Deaf where his classes were conducted in American Sign Language and he uses a video relay service to make telephone calls, which allows a deaf person who uses sign language to call a hearing person by videoconferencing through a qualified sign language interpreter. *Id.* ¶¶ 7, 23. The only way Mr. Prakel is able to follow proceedings such as the court hearings at issue in this case is to use auxiliary aids and services such as a qualified sign language interpreter. *Id.* ¶ 9.

Ms. Prakel is Steven Prakel's mother. She is a hearing individual and was the criminal defendant in proceedings held during the time period relevant to this litigation in Dearborn Circuit Court and Dearborn Superior Court. The criminal proceedings at issue in this litigation were open to the public, which includes family members of criminal defendants. Cleary Dep. at 8, 16; Humphrey Dep. at 29, 33. Ms. Prakel wanted her son to attend the court proceedings in which she was involved, both to provide emotional

support and to better understand the legal situation she was facing.  C. Prakel Decl. ¶¶ 6, 14.  Mr. Prakel has testified that he wished to attend his mother's court proceedings for the same reasons.  S. Decl. ¶ 8.

Defendants are two Dearborn County Judges, a Dearborn County Magistrate, the Indiana Supreme Court Chief Justice, the Indiana Division of State Administration ("the Division") and the State of Indiana.  The Honorable James D. Humphrey is the judge of the Dearborn Circuit Court and the Honorable Jonathan Cleary is judge of the Dearborn Superior Court No. 1.  Kimberly Schmaltz is a Dearborn County magistrate.  All of the judicial officers in this case are named in their official capacities and liability is asserted against them jointly and severally.

**The Indiana Court System**

The State of Indiana does not have a unified court system.  Rather, Indiana courts consist of separately elected judicial officers in each county as provided for by Article 7, Section 7 of the Indiana Constitution.  Remondini Dep. at 9, 62.  The Dearborn Circuit and Superior Courts are established under the Indiana Constitution and the Indiana Code. Ind. Const. Art. 7, § 7, Ind. Code § 33-33-15-2; Ind. Code § 33-29-1.  The powers of the Dearborn Circuit and Superior Courts are also established by statute.  Ind. Code § 33-28-1-5; Ind. Code § 33-29-5-3.  The salaries of the Dearborn Circuit and Superior Court judges are paid by state funds and the rate of pay is established by statute.  However, the county courts' operating expenses including staff and other expenses are paid for by the individual counties in which the courts sit.  *See* Ind. Code § 33-33-82-29 (budgets

submitted to county auditor for approval by the county council).  The individual courts, in

conjunction with county officials, develop and administer their own budgets each year

and set their own budgetary policies.  Humphrey Dep. at 6-7.  Neither the Indiana

Supreme Court nor the Division plays any role in the day-to-day operations or

governance of the individual county courts, including the manner in which they conduct

any given proceeding.  *See* IND. CONST. art. 7, §§ 1, 4, 7; IND. CODE §§ 33-24-1, 3, 6;

IND. CODE § 33-33-25.

The Indiana Supreme Court provides certain funding to the trial courts through

grants for specific projects and programs, including, *inter alia*, the provision of grants for

improvements in technology and funding for special projects, such as providing

interpreters for litigants with limited English language proficiency.  The Supreme Court

receives federal funding that is distributed by the Division for use by drug courts, for

domestic violence training, for tracking CDL violations, and for child support

enforcement, but has not received federal grants for provision of interpreters in recent

years.  Remondini Dep. at 66.

The Division operates under the supervision of the Indiana Supreme Court.  Its

primary functions are to serve as "paymaster" for judges and prosecutors and to provide

support services and consultation to trial court judges.  Remondini Dep. at 7-8.  The

Division serves as a resource to Indiana state court judges, but does not direct the

activities of the state courts.  *Id.* at 9, 62.  By statute, the Division examines business and

administrative methods and systems of the courts; collects and compiles statistical data

on the courts; prepares reports on judicial work; assists the judicial nominating commission and the judicial qualifications commission; administers the civil legal aid fund; and administers the judicial technology project and other technology activities, among other responsibilities. IND. CODE § 33-24-6-3; Remondini Dep. at 8. The Division makes no decisions concerning the provision of interpreters or expenditures of money for interpreters. The Division does not have the authority to order a county court to provide interpreter services. Such decisions lie solely with the county court judges. Remondini Dep. at 69-70.

**The Judicial Proceedings**

Prior to the court proceedings which led to the instant litigation, Ms. Prakel pled guilty in Dearborn Circuity Court to driving while intoxicated causing serious bodily injury. As part of her sentence, she had her driver's license suspended for five years. Subsequently, in 2010, while still on probation, Ms. Prakel was stopped by police for driving with a suspended license. As a result, Ms. Prakel was required to appear in Dearborn Circuit Court for probation revocation proceedings and in Dearborn Superior Court No. 1 on a charge of operating while suspended. Humphrey Dep. at 12-14; Cleary Dep. at 8. The probation revocation and misdemeanor proceedings are the court hearings about which Plaintiffs complain.

**Dearborn Superior Court No. 1**

Mr. Prakel asserts that he first requested interpreter services from Dearborn Superior Court No. 1 for a hearing in his mother's case that was set for April 29, 2010.

S. Prakel Decl. ¶¶ 10-11.  It appears from the Dearborn Superior Court's Chronological Case Summary that the proceeding that was set for April 29 was a pretrial conference. Defs.' Exh. B at 2.  According to Mr. Prakel, he appeared at the courthouse on April 29 to discover that he had not been provided an interpreter.  Judge Cleary presided over the conference, but Mr. Prakel was unable to understand the proceedings without the services of an interpreter.  S. Prakel Decl. ¶¶ 15, 17.

On May 14, 2010, Mr. Prakel contacted the Superior Court No. 1 and requested that he be provided an interpreter for all of his mother's court proceedings.  Mr. Prakel alleges that he was told the court would not provide interpreters unless he was a witness or a defendant.  Mr. Prakel persisted in asserting a need for an interpreter and was informed that Judge Cleary would be consulted about his request.  *Id.* ¶¶ 11-13.  At the Superior Court's behest, Mr. Prakel submitted a written request for an interpreter and Judge Cleary scheduled at hearing for June 23, 2010 to address the request.  Pls.' Exh. G. Mr. Prakel did not appear at that hearing, however.  Mr. Prakel contends that although he was in the courthouse that day, he did not attend the hearing because no interpreter had been provided to assist him, so he knew he would not have been able to understand what was being said or to communicate at the hearing at which his need for an interpreter was to be decided.  Mr. Prakel testified that when he arrived at the courthouse and discovered that no interpreter had been secured for the hearing, he approached a woman working in the court and asked why there was no interpreter.  According to Mr. Prakel, the woman

refused to write back and forth or otherwise communicate with him.  S. Prakel Decl. ¶¶ 16-21.

At the June 23rd hearing, Judge Cleary questioned Ms. Prakel's attorney, Timothy Day, about Mr. Prakel's need for an interpreter.  Mr. Day responded that he did not believe it was necessary at that point in time for the court to provide Mr. Prakel an attorney because he was not a witness or participant in the proceeding, but Mr. Day did express some confusion regarding the court's responsibility to Mr. Prakel and mentioned the possibility of consulting the Judicial Commission for guidance.  Day Aff. ¶¶ 15-16; Defs.' Exh. F. at 3-4 (Transcript of June 23, 2010 Hearing).  Ms. Prakel was present with her attorney and did not object to or otherwise contradict Mr. Day's statement.  Day Aff. ¶¶ 17-18.  Judge Cleary denied Mr. Prakel's request for an interpreter.  Mr. Prakel later learned that, in addition to denying his request for an interpreter, Judge Cleary also discussed with Mr. Day in open court whether Mr. Prakel would need someone to take care of him if his mother was incarcerated.  Mr. Prakel testified that it was "hurtful and demeaning" for him to discover that the court engaged in such a discussion outside of his presence and without his participation.[1]  *Id.* ¶ 20.

The following year, in April 2011, Ms. Prakel had another court appearance in Superior Court No. 1 at which a guilty plea and sentencing order were submitted.  Defs.' Exh. B at 2-3.  In advance of this court appearance, Mr. Prakel contacted the court

---

[1] Because Mr. Prakel was neither a party nor a witness, his only entitlement to participate in the proceeding was as a spectator.

through relay services to request that an interpreter be provided for him.  No such services were provided and Mr. Prakel was unable to understand the courtroom proceedings that occurred that day.  S. Prakel Decl. ¶ 37.

**Dearborn Circuit Court**

In May 2010, Mr. Prakel telephoned the Dearborn Circuit Court using the video relay service to request that the court provide him an interpreter for future proceedings involving his mother.  The individual who answered the telephone in Magistrate Kimberly Schmaltz's chambers told him that he would not be provided an interpreter unless he was a witness or a litigant.  When he persisted, he was told to file a written request, which he did on May 20, 2010.  S. Prakel Decl. ¶¶ 22, 24-27.  According to Mr. Prakel, when he did not receive a response to his written request, he tried to contact the court to inquire about the status of his request, but the court refused to accept his video relay call.  *Id.* ¶ 28.  Mr. Prakel testified that he was told that the court was "upset" and "annoyed" by his requests for an interpreter.  *Id.* ¶ 29.

Judge Humphrey, who presided over Ms. Prakel's probation revocation proceedings, received Mr. Prakel's written request for an interpreter.  In response, he contacted Mr. Day as well as the Division of State Court Administration ("the Division") to inquire about the request. Mr. Day told Judge Humphrey that an interpreter was not necessary because Mr. Prakel was not scheduled to be a witness or participate in the

proceedings involving his mother.[2]  After speaking with Mr. Day and consulting with the Division, Judge Humphrey denied Mr. Prakel's request for an interpreter.  Humphrey Dep. at 36.

On June 30, 2011, a fact-finding hearing on Ms. Prakel's probation revocation charge was held in Dearborn Circuit Court at which Ms. Prakel entered an admission.  A sentencing hearing followed in Ms. Prakel's case on July 6, 2011 as well as an additional proceeding held on July 7, 2010.  S. Prakel Decl. ¶ 32.  Because the court had declined to provide interpreter services to Mr. Prakel, Ms. Prakel paid for a sign language interpreter to be present at both of those hearings so that Mr. Prakel could understand the proceedings.  She paid a total of $264.00 for qualified interpreter services.  Pls.' Exh. Q.

**Requests for Reimbursement**

Following the above-described court proceedings, Mr. Prakel contacted the National Association for the Deaf ("NAD").  On November 9, 2010, the NAD sent a letter on the Prakel's behalf to the Dearborn County Court, addressed to Judge Humphrey, requesting that the Circuit Court reimburse Ms. Prakel for costs she incurred in securing interpreter services for the two July 2010 hearings.  Pls.' Exh. K.  Judge Humphrey contacted the Division upon receiving the letter, but made no written response to the reimbursement request.  Humphrey Dep. at 24, 22, 32.

---

[2] In a 2009 hearing at which Mr. Prakel was to be a witness, the Dearborn Circuit Court retained and paid for an interpreter for him.  Humphrey Dep. at 13.

On February 4, 2011, a representative from the NAD called Judge Humphrey's chambers and left a message requesting that the organization be informed whether he had received its letter. When no response was received, the NAD called Judge Humphrey's chambers a second time on March 9, 2011. Judge Humphrey's executive assistant answered the call and informed the NAD representative that she would ask Judge Humphrey whether he had received the letter and would also investigate the reason the interpreter request was denied. However, neither Judge Humphrey nor any other court official responded further to the NAD's inquiries.

On April 22, 2011, NAD sent a letter addressed to then-Chief Justice Randall T. Shepard of the Indiana Supreme Court, outlining the facts and the NAD's view of the law as well as its attempts to contact Judge Humphrey. Pls.' Exh. L. at 1-3. The letter requested that Ms. Prakel be reimbursed for the funds she expended to hire an interpreter and that the state court system investigate the situation further. *Id.* at 3. It is undisputed that the NAD's letter was received but that no response was forthcoming or further action taken by the Indiana Supreme Court.

**The Instant Litigation**

On April 13, 2012, Mr. Prakel and Ms. Prakel filed the instant Complaint, alleging that Defendants violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to provide Mr. Prakel an interpreter so he could fully access the court proceedings in which his mother, Ms. Prakel, was a defendant. In their Complaint, Plaintiffs seek reimbursement for the interpreter expenses Ms. Prakel incurred; compensatory damages;

and attorneys' fees and costs. Plaintiffs and Defendants filed cross-motions for summary judgment on October 9, 2013 and November 22, 2013, respectively. On January 1, 2014, the United States filed a "Statement of Interest" in support of Plaintiffs' summary judgment motion.

## Legal Analysis

### I. Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in the case before us, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II.    Scope of Claims

Before turning to the merits of the parties' arguments in this case, we first must determine the scope of the claims before us. The prayer for relief in the Complaint lays out the following specific recoveries sought by Plaintiff:

a. To reimburse Ms. Prakel for the interpreter expenses she incurred to enable her son to access the aural content of her court proceedings[;]
b. To award compensatory damages to Plaintiffs;
c. To award Plaintiffs attorneys' fees and costs;
d. To award Plaintiffs any and all other relief as available and may be necessary and appropriate.

Pls.' Compl. at 15. Plaintiffs' prayer for relief does not include a specific request for declaratory relief nor does it seek relief for any injury beyond what they contend they suffered as a result of not having been provided interpreter services by the Dearborn

County courts. In their motion for summary judgment, however, Plaintiffs for the first time request a declaration not just that Mr. Prakel was entitled to interpreter services under the particular facts of this case, but also that "Defendants are required to provide auxiliary aids and services to ensure that deaf spectators receive the benefits of effective participation in court proceedings" throughout the State of Indiana. Pls.' Br. at 1-2, 21-22.

It is well-established under Seventh Circuit law that parties cannot amend their complaints through arguments made in response to a motion for summary judgment. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (citations omitted). Had Plaintiffs desired to amend their complaint, they should have timely filed a motion to amend. Allowing Plaintiffs to expand the scope of the litigation at this point to address whether all deaf spectators in every court in Indiana are entitled to sign interpreters upon request would require us to start essentially from scratch in this litigation as that particular claim involves a very different kind of proof and defenses than do the limited issues before us.

For example, as Defendants argue, while they have not asserted the defenses of undue burden and fundamental alteration in connection with Plaintiffs' limited request for reimbursement and compensatory damages related to the failure of the Dearborn County courts to provide Mr. Prakel with an interpreter on a very limited number of occasions, requiring interpreters for all deaf spectators for all court proceedings throughout the State of Indiana would obviously involve very different considerations,

including vastly greater financial and administrative burdens.  Accordingly, discovery would need to be reopened to permit Defendants to gather evidence from all state courts and county governments concerning the impact of such a requirement on individual courts.  *See* 28 C.F.R. § 35.164 (providing that whether compliance under Title II of the ADA would be an undue burden or fundamental alteration is a decision that must be made by the head of the public entity or designee "after considering all resources available for use in funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion").  It is simply too late in this litigation to entertain so fundamental a change of direction in the scope of relief being sought by Plaintiffs.  Thus, we limit our findings to the facts of this case and the specific claims and relief as advanced by Plaintiffs in their Complaint.

## III.    Standing

Defendants first argue that Plaintiffs do not have standing to bring their claims. To have standing to pursue a claim, a plaintiff must show that he or she "has suffered (or is imminently threatened with) (1) a concrete and particularized 'injury in fact' (2) that is fairly traceable to the challenged action of the defendant, and that is (3) likely to be redressed by a favorable judicial decision." *Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 819 (7th Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Defendants argue that Plaintiffs have failed to establish the first and third requirements for standing, to wit, that they suffered injuries-in-fact, and that any injuries they may have suffered can likely be redressed.  The State Defendants (the State

of Indiana, Chief Justice Rush in her official capacity, and the Division) further argue that both Plaintiffs have failed to show that any injury that may have been suffered is "fairly traceable" to any action taken by the State, the Indiana Supreme Court, or the Division, and thus, that Plaintiffs' claims against them should be dismissed for lack of standing. We address these issues in turn below.[3]

Defendants contend that Ms. Prakel suffered no cognizable injury as a result of her son's failure to receive interpreter services, and thus has no standing to bring an independent claim. We disagree. Ms. Prakel alleges an associational claim under the ADA and Section 504 based on discrimination against her because of her association/relationship with her son. It is true that, unlike Title I and Title III of the ADA, Title II of the ADA does not expressly prohibit associational discrimination. However, the implementing regulations include this express prohibition within Title II's prohibition of discrimination by public entities, providing: "A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35.130(g). An associated individual "is not permitted to sue just because the disabled individual is injured, but only

---

[3] Defendants also argue that Plaintiffs do not have standing to bring a claim seeking injunctive relief because they have failed to establish that they are at risk of suffering future discrimination as they have not alleged that they have attempted to or intend to return to the Dearborn courts. *See Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) ("Courts have held that a plaintiff lacks standing to seek injunctive relief unless he alleges facts giving rise to an inference that he will suffer future discrimination by the defendant."). However, because Plaintiffs have not sought injunctive relief, this argument is irrelevant.

when the associated individual is herself injured." *Means. v. St. Joseph Cnty. Bd. of Com'rs*, No. 3:10-CV-003 JD, 2011 WL 4452244, at *4 (N.D. Ind. Sept. 26, 2011).

Here, Ms. Prakel has alleged that she suffered a separate injury as a result of her association with Mr. Prakel. It is undisputed that she paid for the services of an interpreter on one occasion for her son when the Dearborn County courts declined to provide such services. She also contends that she was deprived of the emotional support of her son (at least with regard to the June 2010 and April 2011 hearings at which Mr. Prakel did not have an interpreter) because, without an interpreter, he was unable to fully participate in court proceedings as a spectator and provide meaningful support thereafter. These are distinct injuries-in-fact sufficient for standing purposes. *See, e.g.*, *Baaske v. City of Rolling Meadows*, 191 F. Supp. 2d 1009, 1016 (N.D. Ill. 2002) (requiring allegations of (1) relationship or association and (2) separate injury for associational discrimination claim under Title II). Moreover, Ms. Prakel's injuries can be redressed through reimbursement of the interpreter fee and damages for the emotional distress she alleges she suffered. *See King v. Indiana Supreme Court*, No. 1:14-cv-01092-JMS-MJD, 2014 WL 5798583, at 4 (S.D. Ind. Nov. 7, 2014) (citing *Grant-Hall v. Cavalry Portfolio Servs., LLC*, 856 F. Supp. 2d 929, 936 (N.D. Ill. 2012) (holding that claim for "compensatory damages" satisfies redressibility)).

Mr. Prakel has similarly established the first and third requirements of standing. His inability to meaningfully access the content of his mother's public court proceedings is a cognizable injury for standing purposes, and further, is an injury that can be redressed

through compensatory damages. The only case cited by Defendants in support of their argument that Mr. Prakel suffered no actual injury – *Bronk v. Utschig*, Nos. 12-cv-832-wmc, 12-cv-833, wmc, 2012 WL 6586485 (W.D. Wis. Dec. 17, 2012) – is distinguishable. In *Bronk*, the plaintiff filed two *Bivens* lawsuits arising out of his father's underlying bankruptcy proceeding, purporting to act as the "primary family representative" in the bankruptcy proceedings. *Id.* at *2. In those lawsuits, the plaintiff, who had a "60% documented hearing disability," alleged that the bankruptcy judge violated his civil rights and Title III of the ADA[4] by holding an evidentiary hearing telephonically rather than in open court as requested by the plaintiff's father's attorney. *Id.* at *2-*3. The plaintiff alleged that he was unable to hear or understand much of the telephonic proceedings and, as a result, requested that a mistrial be declared in his father's case as well as an award of compensatory damages. The district court dismissed the plaintiff's constitutional claims on standing grounds, reasoning that the plaintiff had not suffered an actual injury due to his hearing difficulties because, even assuming the

---

[4] The district court found that Title III of the ADA, which regulates "private entities" operating "places of public accommodations," did not apply to plaintiff's claims because the defendants were employed by the federal government. *Bronk*, 2012 WL 6586485, at *5. The court went on to analyze the plaintiff's claims under Title II of the ADA, finding that the plaintiff's claims could not survive under that provision because "federal courts, as agencies of the federal government, are exempted from Title II disability discrimination claims." *Id.* The court did recognize that, despite being exempt from Title II's requirements, the Judicial Conference of the United States requires federal courts to provide "sign language interpreters or other auxiliary aids and services to participants in federal court proceedings who are deaf, hearing impaired or have communications disabilities," but noted that the definition of "participant" under those guidelines includes only "parties, attorneys, and witnesses." *Id.* (citing 5 GUIDE TO JUDICIARY POLICY §§ 255.20(c)(4), 225.20(c)(1)). Accordingly, the plaintiff's lawsuits in *Bronk* were dismissed. Given that Defendants here are state courts that are subject to Title II and its specific regulations, this part of the *Bronk* analysis has limited, if any, applicability to the situation before us.

sound quality compromised his ability to listen in during the hearing (which the court noted was the only right he had with regard to participation in the hearing as he had not moved to intervene or appear), he was provided the court reporter's transcript of the hearing approximately two weeks later, and thus was able to access the full content of the telephonic hearing. *Id.* at *4. Here, however, there is no evidence that Mr. Prakel was subsequently provided transcripts of the criminal hearings or other similar accommodation, and thus, unlike the plaintiff in *Bronk*, Mr. Prakel *did* suffer an actual injury when he was unable to access the aural content of the public court proceedings at issue in this litigation.

We turn now to address whether Plaintiffs' injuries are "fairly traceable" to actions taken by Defendants. There is no dispute that this requirement is satisfied as to the Dearborn Court Defendants, and thus, we find that Plaintiffs have standing to sue Magistrate Schmaltz, Judge Humphrey, and Judge Cleary in their official capacities. However, Defendants argue that Plaintiffs have failed to show that there is a causal connection between their injuries and the conduct of either the Indiana Supreme Court or the Division.[5] We agree that Plaintiffs have not established that their injuries are "fairly traceable" to the challenged actions of the State Defendants. Plaintiffs allege that they suffered injuries as a result of the decisions made by the Dearborn Courts to deny Mr.

---

[5] While not couched as a standing argument in Defendants' brief, the contention that Plaintiffs' injuries were not caused by the State Defendants is essentially an argument that Plaintiffs' injuries are not fairly traceable to the State Defendants' conduct as is required to establish standing. *See Cabral v. City of Evansville, Ind.*, 759 F.3d 639, 644 (7th Cir. 2014) (dismissing appeal on standing grounds because the appellant could not show it suffered any injury "traceable to, or caused by" the city defendant).

Prakel's requests for a sign language interpreter. But they have failed, at least on the narrow facts presented by this case, to establish that the State Defendants had sufficient oversight over those decisions to satisfy the causation element of standing.

It is true, as Plaintiffs argue, that the Indiana Rules of Trial Procedure promulgated by the Indiana Supreme Court afford the trial courts the authority to engage an interpreter and specifically instructs trial judges to apply the rule in compliance with the ADA. *See* Ind. T.R. 43(C) (providing that the trial court "may appoint an interpreter of its own selection and may fix his reasonable compensation" and that "[a]pplication of this rule shall be in compliance with the Americans with Disabilities Act"). But the mere fact that the Supreme Court promulgated this trial rule is not a sufficient basis under which to hold the State Defendants liable. "A person aggrieved by the application of a legal rule does not sue the rule *maker*…. He sues the persons whose acts hurt him." *Quinones v. City of Evanston, Ill.*, 58 F.3d 275, 277 (7th Cir. 1995).

Here, it was the Dearborn Courts' failure to provide Plaintiffs with a sign language interpreter that was the cause of Plaintiffs' alleged injuries in this lawsuit. Plaintiffs have failed to adduce evidence to show that the State Defendants had any direct oversight over those decisions, at least in the narrow case before us. It is undisputed that Indiana does not have a unified court system and that, although the Dearborn Circuit Court and Dearborn Superior Court No. 1 judges' salaries are paid out of state funds, the trial courts' operating costs, including staff and other expenses are paid for by the individual

counties in which the courts sit. The trial court judges are responsible for preparing and presenting their own budgets to the County Council for approval. Humphrey Dep. at 6.

Although there is an interpreter fund[6] operated by the Division that provides grant money to trial courts to help underwrite the cost of interpreters, the Indiana Supreme Court has no policies governing the trial courts' determinations regarding distribution of those funds, except to encourage the use of certified interpreters. Beyond the requirement that a trial court that receives the money must use at least 60% of the funds for certified as opposed to uncertified interpreters,[7] the State Defendants have no further involvement in the process of deciding how or when or to whom the money is distributed by the trial court, such as setting statewide policies governing interpreter requests or holding any responsibility for determining whether to grant or deny any particular request for interpreter services. Remondini Dep. at 17-18; 37-38; 53-54; 62-63. Such decisions are within the purview of the individual trial courts.[8] The amount of grant money each trial court receives from the fund is variable and depends on a number of factors, including the total amount available in the fund in a particular year as well as the specific amount requested by a trial court based on its predicted need. *Id.* at 18. In some cases the funds a trial court receives from the state interpreter fund may be sufficient to cover

---

[6] The State Defendants also provide funding for the Language Line which provides access to interpreters in more than 200 languages, but American Sign Language is not one of those languages.

[7] The Division maintains a list of certified interpreters, but the list does not include certified American Sign Language interpreters. Remondini Dep. at 36.

[8] Trial court judges are free to consult the Division regarding provision of interpreter services, as Judge Humphrey did here, but the final determination of whether to provide an interpreter is made by the trial court judge.

all costs associated with providing interpreters, but in most cases, trial courts must set aside money in their budgets to supplement the state court funds.[9]  *Id.* at 33.

We can certainly conceive of circumstances in which the actions of the State Defendants in administering this interpreter fund might be the cause of a plaintiff's injuries, such as if the decision to deny appointment of an ASL interpreter was specifically based on the lack of funds for such an interpreter.  But that is not the situation presented here.  Although Defendants argue generally that requiring courts statewide to provide ASL interpreters for spectators at public court proceedings would not be feasible for both practical and budgetary reasons, the Dearborn County courts never based their denials of Mr. Prakel's requests on a lack of funds in this specific case; rather, they determined only that Mr. Prakel did not require an interpreter because he was not a participant in the proceedings at issue.  Accordingly, there is no connection between the denial of Mr. Prakel's requests for interpreter services and any lack of state-provided funds on the record before us.

Thus, because Plaintiffs' alleged injuries stem from the decision of the Dearborn Circuit and Superior Courts to deny Mr. Prakel's requests for interpreter services and none of the State Defendants had the authority to direct or oversee that decision nor is there evidence establishing that a lack of state-provided funds was the reason for the Dearborn Courts' denial of Plaintiffs' requests for interpreter services, we find that

---

[9] Typical grants received by Dearborn County courts in the past have been approximately $3,000.  Humphrey Dep. at 28.

Plaintiffs have failed to show that their alleged injuries are "fairly traceable" to or caused by any action taken by the State Defendants.[10]  Accordingly, we hold that Plaintiffs' claims against the State Defendants must be dismissed for lack of standing.  Defendants' Motion for Summary Judgment is thus <u>GRANTED</u> as to the State Defendants.

## IV.    Waiver

We next address Defendants' argument that Ms. Prakel waived her claims under the ADA and Rehabilitation Act "when she assented, through her counsel and without her objection, to participating in court proceedings without a sign interpreter present."  Defs.' Br. at 21. Defendants' waiver argument is based on representations made by Mr. Day in the June 23, 2010 hearing before Judge Cleary in Dearborn Superior Court No. 1 held for the purpose of addressing Mr. Prakel's written request for an interpreter for his mother's criminal proceedings in that court and a 2011 telephone call with Judge Humphrey regarding Mr. Prakel's need for an interpreter to access Ms. Prakel's criminal proceedings in Dearborn Circuit Court.

At the June 23, 2010 hearing, Judge Cleary asked Mr. Day whether he saw "any need" for the court to have a sign language interpreter for Mr. Prakel.  Mr. Day responded as follows:

---

[10] Nor is there merit to Plaintiffs' contention that the State Defendants had a duty to intercede on their behalf as a result of the letter sent by the National Association for the Deaf to the Indiana Supreme Court requesting that Plaintiffs be reimbursed for the costs associated with personally retaining a sign language interpreter for Mr. Prakel.  As Plaintiffs argue, the mere act of directing a letter to an entity asking it to pay a bill or to direct another entity to do so does not create a duty where one does not otherwise exist.

At this point, I do not. He would not be a witness, he's obviously not a litigant, um, he is someone who is greatly affected by what happens to her. I would assume if she can sign to him during a subsequent proceeding so he at least knows what's going on but those arrangements have to be made if she does go to jail as far as where he is going to live, who is going to take care of him, who's going to do the things he can't do. Um, so to that extent I guess he is affected by this, has an interest in it. I just don't know if we need to consult with the Judicial Commission or someone to see um, is the Court required to provide him with an interpreter when he is not a witness or a party. I can't answer that, I just, you know, I would think that if he was a party certainly and even a witness certainly, but we are in a gray area as far as someone being affected by it but not technically involved in it, so I don't know how to answer that other than I told him through my client today that there's really not anything going to happen today that would involve or have any negative affect on him we are just here discussing … (Court interrupts)[.]

Defs.' Exh. F. at 3-4. After hearing from both parties on the issue, Judge Cleary ruled that Mr. Prakel was not barred from the courtroom and that he was entitled to pay for his own interpreter or have Ms. Prakel sign for him, but that the court would not provide an interpreter for him. Neither Mr. Day nor Ms. Prakel objected to this ruling and Ms. Prakel did not again raise the issue before Judge Cleary.

Mr. Day also testified by affidavit that Judge Humphrey contacted him by telephone after receiving a written request for interpreter services from Mr. Prakel to inquire whether it was necessary for Mr. Prakel to have an interpreter at Ms. Prakel's proceedings in Dearborn Circuit Court. Mr. Day told Judge Humphrey that he did not believe Mr. Prakel needed an interpreter because he was not a party to the proceedings or otherwise involved as a participant. According to Mr. Day, Ms. Prakel never objected or indicated that an interpreter was needed for her appearances in Dearborn Circuit Court.

Instead, she personally paid for a sign language interpreter so her son could understand subsequent court proceedings.

We agree with Defendants that Ms. Prakel waived her ADA and Section 504 associational claims stemming from the Dearborn County courts' refusal to provide her son an interpreter for her criminal proceedings. Under Seventh Circuit law, "'waiver is a flexible concept with no definite and rigid meaning' that is 'generally defined as an intentional relinquishment of a known right,' but which is often construed as 'an equitable principle used by courts to avoid harsh results when a party has conducted itself in such a way as to make those results unfair.'" *King v. Kramer*, 763 F.3d 635, 641 (7th Cir. 2014) (quoting *Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 370 (7th Cir. 1978)).

Here, while Mr. Day expressed some confusion as to whether Mr. Prakel was entitled to an interpreter at the June 23, 2010 hearing convened by Judge Cleary in Dearborn Superior Court No. 1 to address the issue, Mr. Day clearly stated that at that point in time he did not believe Mr. Prakel needed an interpreter. He certainly did not express any reservations about proceeding with Ms. Prakel's judicial proceedings in the absence of an interpreter and did not object or ask to continue the hearing when the court ruled that Mr. Prakel would not be provided an interpreter. Nor did Mr. Day or Ms. Prakel raise the issue in front of the court on any subsequent occasion. Likewise, Ms. Prakel does not dispute that Mr. Day spoke on her behalf to Judge Humphrey and explicitly stated that Mr. Prakel did not need an interpreter for Ms. Prakel's court

proceedings in Dearborn Circuit Court. The issue was not raised before the court again. Given these facts and considering the totality of the circumstances presented here, we find that Ms. Prakel thus waived any rights she may have had under the ADA and/or Section 504. Accordingly, Defendants' Motion for Summary Judgment is <u>GRANTED</u> as to Ms. Prakel's claims.

Defendants do not assert that Mr. Day's waiver of Ms. Prakel's rights extends to Mr. Prakel, however. There is no dispute that Mr. Prakel consistently and repeatedly requested interpreter services in order to access his mother's criminal proceedings. We agree that Mr. Day's conduct can in no way be construed as a waiver of Mr. Prakel's rights under the ADA or Section 504 as Mr. Day did not represent Mr. Prakel at any point relevant to this litigation. Nor does our finding that Ms. Prakel has waived her claims have any effect on Mr. Prakel's rights as his claims are not derivative of Ms. Prakel's. Thus, we proceed to address the parties' remaining arguments as to Mr. Prakel's claims only.

## V. Judicial Immunity

Defendants contend that the judicial defendants (Magistrate Judge Schmaltz, Judge Humphrey, and Judge Cleary, in their official capacities) are protected from Mr. Prakel's suit by the doctrine of absolute judicial immunity. However, judicial immunity is a personal defense reserved for individuals. *See Hernandez v. Sheahan*, 455 F.3d 772, 776 (7th Cir. 2006) ("Official immunities (judicial, legislative, absolute, qualified, quasi, and so on) are personal defenses designed to protect the finances of public officials

whose salaries do not compensate them for the risks of liability under vague and hard-to-foresee constitutional doctrines. That justification does not apply to suits against units of state or local government, which can tap the public fisc."); *Newman v. State of Ind.*, 129 F.3d 937, 942 (7th Cir. 1997) ("[I]t is to spare judges from shrinking from doing their duty out of fear of being sued that the doctrine of absolute judicial immunity was devised."). Mr. Prakel has not named any individual defendants in this suit; rather, all defendants are named in their official capacities, and it is well-established that "[a]n official capacity suit is tantamount to a claim against the governmental entity itself." *Guzman v. Sheahan*, 495 F.3d 852, 859 (7th Cir. 2007) (citations omitted). Accordingly, absolute judicial immunity does not shield the judicial defendants in this case from Mr. Prakel's suit.[11]

## VI. Eleventh Amendment Immunity

We turn next to address Defendants' contention that Mr. Prakel's claims for compensatory damages brought under the ADA and Section 504 are barred by the Eleventh Amendment.

### A. ADA Claim

---

[11] In support of their contention that judicial immunity applies here, Defendants cite *Rafford v. Snohomish County*, No. C07-0947RSL, 2008 WL 346386 (W.D. Wash. Feb. 6, 2008), *aff'd*, 349 Fed. App'x 245 (9th Cir. 2009) and *Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001). However, in both cases, judicial immunity was found to bar only those claims that were brought against judicial defendants for money damages in their individual capacities. Accordingly, they do not aid Defendant's argument in this case.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "An unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (quotation marks and citation omitted). Congress may, however, abrogate the State's Eleventh Amendment immunity. To determine whether Congress has done so in a particular case, courts "must resolve two predicate questions: first, whether Congress unequivocally expressed its intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant to a valid grant of constitutional authority." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000).

With regard to the first question, Title II of the ADA expressly provides: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. Accordingly, there can be no dispute that Congress clearly and unequivocally expressed its intent to abrogate sovereign immunity for claims such as Mr. Prakel's brought pursuant to Title II of the ADA.

The second question is not so easy to resolve, however. In *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court addressed the extent to which Congress's abrogation of Eleventh Amendment immunity in Title II of the ADA is constitutional. In *Lane*, two

plaintiffs brought an action against the state of Tennessee alleging violations of Title II because they were unable to physically access certain areas of state courthouses. Tennessee moved to dismiss the lawsuit, arguing that it was barred by the Eleventh Amendment. In addressing the question of whether Congress's abrogation of sovereign immunity in Title II was appropriate, the Supreme Court engaged in a three-party inquiry, first examining the scope of Title II to determine the rights Congress sought to enforce with its enactment; then analyzing whether there was a history of unconstitutional discrimination; and finally addressing whether Title II was an appropriate response to such discrimination. *Id.* at 522-534.

With regard to the first issue, the *Lane* Court focused its analysis on Title II only as it applied "to the class of cases implicating the accessibility of judicial services." *Id.* at 531. The Court found that Congress had documented a pattern of discrimination against disabled individuals in public services and noted in particular the history discrimination with reference to the accessibility of public facilities. *Id.* at 524-29. After completing this analysis, the Court held that Title II was a "congruent and proportional" response to this documented history of discrimination, given that a fundamental right was at issue and that Title II requires only "reasonable modifications" that would not jeopardize the state's financial health or fundamentally alter the nature of the public service. *Id.* at 531-32. Based on this analysis, the Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of

Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 533-34.

As was the case in *Lane*, the fundamental right of access to judicial services is also at issue here. Defendants contend that the *Lane* holding does not extend to this case because it implicates the rights of a spectator as opposed to the rights of a party or other participant in the litigation. However, as the *Lane* court specifically observed, among the "fundamental rights of access to the courts" that Title II protects is the First Amendment right of access to criminal proceedings (including preliminary hearings) by members of the public. *Id.* at 523 (citing *Press-Enterprise Co. v. Superior Court of Cal., Cnty. of Riverside*, 478 U.S. 1, 8-15 (1986)).[12] Thus, *Lane* applies here, and Defendants are not immune from Mr. Prakel's claim that he was denied access to the courts based on his disability.

## B. Rehabilitation Act Claim

Mr. Prakel also alleges a violation of Section 504 of the Rehabilitation Act. In 1986, Congress amended the Rehabilitation Act to provide that a "State shall not be

---

[12] We also note that, in *Lane*, the Supreme Court did not address any distinction between spectators and direct participants with regard to the accessibility of judicial services, despite the fact that one of the plaintiffs, Beverly Jones, was not seeking access to the courthouse as a party to any legal action or as a witness or other direct participant in a criminal proceeding. Rather, she was a court reporter who alleged both that she lost work opportunities and the ability to be involved in the judicial process because she was unable to access several county courthouses. Given that the Supreme Court had at that point already held that Title I of the ADA (which applies to disability discrimination in the employment context) does not validly abrogate sovereign immunity, Ms. Jones's claim could only have been based on her status as a member of the public.

immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973…." 42 U.S.C. § 2000d-7. This provision "expressly waives state sovereign immunity for violations of 'section 504 of the Rehabilitation Act of 1973 … by recipients of Federal financial assistance.'" *Sossamon v. Texas*, 131 S.Ct. 1651, 1662 (2011) (emphasis removed). For the first time in their response to the Statement of Interest filed by the United States, Defendants argue that, while they have "in one form or another received some federal funds," the limited federal funds they have received do not make them subject to the requirements of Section 504. Dkt. No. 87 at 6-7.

However, this statement is contrary to every representation they have made up to this point in the litigation. On May 21, 2013, Magistrate Judge Hussmann granted a motion to compel filed by Plaintiffs requiring Defendants to "turn[] over records to allow Plaintiffs to determine whether Dearborn Courts directly or indirectly received federal funding…." Dkt. No. 49 at 4. Defendants were given fifteen days to turn over such discovery or face sanctions. In response, Defendants filed a brief stating that they had "[a]dmitted both in emails and in signed stipulations provided to Plaintiffs that the Defendants receive federal funds" and that, given these admissions, "[t]his issue cannot be resolved any more decisively." Dkt. No. 53 at 1, 4. Magistrate Judge Hussmann took note of these admissions, stating in a June 24, 2013 Order that "Defendants stipulate that both the Indiana Supreme Court and the Dearborn County Circuit and Superior Courts received federal funds." Dkt. No. 55 at 2. Magistrate Judge Hussmann specifically noted

30

that Defendants made this admission in light of their Rule 11 obligations to this court and reminded Defendants that, if in the course of the litigation, they discovered additional documents relevant to their receipt of federal funds, they would be required to turn over any non-privileged relevant documents to Plaintiffs and that, if they failed to do so, they could be subject to sanctions and would be unable to use any such documents at later stages in the litigation. *Id.* at 2-3. Given the clear and unequivocal stipulation by Defendants regarding their receipt of federal funds, they have waived any argument that they are not subject to Section 504 of the Rehabilitation Act.[13]

## V.      ADA and Section 504 Claims

Having now resolved the immunity questions in Mr. Prakel's favor, we turn to the merits of his claims. Title II of the ADA prohibits discrimination by public entities, including state and local courts, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a violation of Title II, a plaintiff must show that: (1) he or she is a "qualified individual with a disability"; (2) he or she was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was otherwise discriminated against by any

---

[13] Plaintiffs have requested attorneys' fees and costs incurred in briefing the issue of receipt of federal funds as a sanction for Defendants' belated attempt to contest this issue after previously representing to the court that they received such funds and ending further discovery on this issue. We decline at this time to award such relief, but the issue may be raised again if necessary once the merits of the litigation are fully resolved.

such entity; and (3) the discrimination was by reason of disability.  *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

Similar to the ADA, Section 504 provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C § 794(a).  The Seventh Circuit generally construes Title II and Section 504 consistently in most respects "[i]n view of the similarities between the relevant provisions … and their implementing regulations."  *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004).  A plaintiff bringing suit under Section 504 must show that: "'(1) he is a qualified person; (2) with a disability; and (3) the [state agency] denied him access to a program or activity because of his disability.'"  *Wagoner*, 778 F.3d at 592 (quoting *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).  For the Rehabilitation Act to apply, the relevant state agency must accept federal funds.  *Id.*  As discussed above, it has been established that the Dearborn Superior and Circuit Court accept federal funds, and thus, we need not discuss this element further further.

### A.      Whether Mr. Prakel is an Individual Protected by the ADA and Section 504

Title II prohibits discrimination against any "qualified individual with a disability," which is defined under the ADA as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of …

communication … barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). It is undisputed that Mr. Prakel is deaf and substantially limited in the major life activities of hearing and speaking, and therefore, has a disability within the meaning of the ADA and Section 504. 42 U.S.C. § 12102(1)-(2).

Mr. Prakel is also a *qualified* individual with a disability because he is a member of the public who wished to attend court proceedings that were open to the public.[14] Defendants argue that, as a spectator rather than a participant (e.g., a party or witness) in his mother's criminal proceedings, Mr. Prakel is not covered by Title II's protections. However, the Title II regulations explicitly provide that "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, *members of the public*, and *companions with disabilities* are as effective as communications with others."[15] 28 C.F.R. § 35.160(a)(1). Under Indiana law, "[c]riminal proceedings are presumptively open to attendance by the general public." IND. CODE § 5-14-2-2. There is no dispute here that each of Ms. Prakel's criminal proceedings that Mr. Prakel sought to attend was open to the public. Moreover, the Supreme Court has recognized that members of the public have constitutional rights to attend public criminal proceedings.

---

[14] There is no dispute that Mr. Prakel is able to access spoken communications during court proceedings when auxiliary aids and services, such as a sign language interpreter, are provided.
[15] The United States Supreme Court has recognized that "[b]ecause the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II …, its views warrant respect." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597-98 (1999) (internal citations omitted).

*See Lane*, 541 U.S. at 527 ("[W]e have recognized that members of the public have a right of access to criminal proceedings secured by the First Amendment.") (citing *Press-Enterprise Co.*, 478 U.S. at 8-15).

Given this clear history of recognition of the public's interest in and right to attend criminal proceedings, we believe there can be no dispute that such interests and rights are included in the protections afforded by Title II of the ADA. This conclusion is buttressed by the 1993 technical guidance issued by the Department of Justice pursuant to its congressionally delegated authority, 42 U.S.C. § 12206, which explains that spectators of Title II programs can be qualified individuals with disabilities. Specifically, the technical assistance states: "*Can a visitor, spectator, family member, or associate of a program participant be a qualified individual with a disability under Title II?* Yes. Title II protects any qualified individual with a disability involved in any capacity in a public entity's programs, activities, or services." The Americans with Disabilities Act Title II Technical Assistance Manual Covering State and Local Government Programs and Services, at II-2.8000 (1993), *available at* http://www.ada.gov/taman2.html.

Defendants also argue that the pretrial criminal proceedings at issue in this litigation are not the type of proceedings contemplated as a "service, program, or activity" within the meaning of Title II because they are not "formal" proceedings such as a trial.[16] However, as Defendants concede, although the ADA does not define "services,

---

[16] Courts have found a trial to be a service, program, or activity within the meaning of § 12132. *E.g.*, *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) (citing *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998)).

programs, or activities," court have adopted the definition from the Rehabilitation Act to include "all of the operations of … a local government." *Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1561 (2012). Given this broad definition, we see no valid justification for distinguishing between public trials and other public court proceedings under Title II and thus find that the public sessions of the Dearborn County courts that Mr. Prakel was excluded from here constitute services, programs, or activities within the meaning of § 12132. For these reasons, we find that Mr. Prakel has met his burden to show that he is a qualified individual with a disability under Title II of the ADA.

### B.     Failure to Provide Appropriate Auxiliary Aids and Services

It is undisputed that Defendants did not provide Mr. Prakel an interpreter or other auxiliary aid or service for court hearings that occurred in April 2010, June 2010, July 2010, and April 2011. It is also undisputed that Mr. Prakel requires a qualified sign language interpreter to access spoken communications during court proceedings. Thus, Mr. Prakel was able to understand only the proceedings that took place in July 2010 because Ms. Prakel personally paid for an interpreter for her son during those proceedings.

The Title II regulations provide: "A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a

public entity." 28 C.F.R. § 35.160(b)(1).    The regulations further define "auxiliary aids and services" as "effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing," and explicitly include "qualified interpreters" as one example of an auxiliary aid or service.  28 C.F.R. § 35.104.  When determining which auxiliary aid or service to provide, the public entity "shall give primary consideration to the requests of individuals with disabilities."  28 C.F.R. § 35.160(b)(2).

A public entity is not, however, required to take any action "that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."  28 C.F.R. § 35.164.  If an auxiliary aid or service would result in a fundamental alteration or undue burden, the public entity "shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity."  *Id.*

Defendants argue that Title II requires only that they make "reasonable accommodations" for individuals with disabilities and that any right Mr. Prakel may have to accommodations "is not absolute, but rather involves a balancing of interests."  Defs.' Br. at 25.  Applying these principles to the case at bar, Defendants contend that drawing a line between spectators and participants in legal proceedings with regard to the provision

of interpreter services is a "reasonable restriction to conserve limited court resources," and thus not violative of Title II. *Id.* at 27.

It is true that certain of Title II's provisions require covered entities to make reasonable modifications of policies, practices, and procedures where necessary to avoid discrimination. 28 C.F.R. § 35.130(b)(7). However, the violations at issue here, to wit, violations of the effective communication provisions of Title II are addressed in a separate section of the statute. 28 C.F.R. § 35.160-164; 28 C.F.R. § 42.503(e), (f). The provisions of Title II at issue in this litigation provide that a public entity "*shall* provide" auxiliary aids and services as necessary as long as the provision of those aids and services does not result in a fundamental alteration in the nature of the service, program or activity provided or constitute an undue burden (financial or otherwise) on the entity.[17]

Defendants point out that the ADA does not require a public entity to provide to individuals with disabilities "personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; readers for personal use or study; or services of a personal nature including assistance in eating, toileting, or

---

[17] Defendants cite *Alexander v. Choate*, 469 U.S. 287 (1985), in support of their contention that the Title II analysis involves "a balancing of interests." Defs.' Mem. at 25. *Choate* is a Section 504 case decided before Title II was enacted and the part of the opinion applicable to Defendants' argument is a discussion of the Supreme Court's decision in *Southeastern Community College v. Davis*, 442 U.S. 397 (1979), which holds that Section 504 requires only reasonable, rather than fundamental or substantial alterations. This idea is already built into the Title II framework, however. The 1991 regulatory guidance accompanying the Title II regulation explains that the affirmative defense of fundamental alteration was included in the statute in consideration of *Davis* and its progeny. As discussed above, Defendants have not asserted the defense of fundamental alteration here, nor does the record before us establish that providing an interpreter for Mr. Prakel would have altered the court proceedings at issue.

dressing," 28 C.F.R. § 35.135, and equate the provision of a sign language interpreter in this case to a reader for personal use or study. Defendants err by equating a sign language interpreter with a "personal device or service," however. *See* 28 C.F.R. § 35.135. Rather, Mr. Prakel's requests for an interpreter are governed by the communication provisions of Title II covering "auxiliary aids and services," the definition of which specifically includes "qualified interpreters." 28 C.F.R. § 35.104.

Finally, Defendants argue that they were not obligated under Title II to provide Mr. Prakel with an interpreter because a requirement that county courts be responsible for providing sign language interpreters for spectators (as opposed only to litigants and witnesses) would place an undue burden on the court system by straining already limited financial resources. But as Defendants have strenuously argued in this case, Mr. Prakel's lawsuit is limited to the question of whether Title II required Defendants to provide interpreter services for Mr. Prakel on a limited number of occasions, not whether the statute requires state courts to provide interpreters for the entire deaf population throughout the Indiana court system. As Defendants themselves argue, the latter would be an entirely different case than is presented here. Limiting our analysis to the facts and claims before us, Defendants have not made a showing that providing interpreter services to Mr. Prakel constitutes an undue burden.

The Title II regulations make clear that the determination of whether compliance with the statute would result in an undue burden or fundamental alteration must be made by the head of the public entity or a designee "after considering all resources available for

use in funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion." 28 C.F.R. § 35.164. Even in cases in which such a determination is made and the requested auxiliary aid or service is not provided, Title II requires public entities to provide whatever aids or services that do not impose an undue burden on the public entity in order to ensure to the maximum extent possible that individuals with disabilities receive the benefits and services provided by the entity. *Id.*

Here, Defendants failed to provide Mr. Prakel with an interpreter for any of the court proceedings for which he requested assistance, or, in the alternative, to propose another auxiliary aid or service in an effort to ensure effective communication to enable Mr. Prakel to access the court proceedings held in Dearborn Superior Court No. 1 and Dearborn Circuit Court. Because Defendants have failed to present evidence to establish that provision of an interpreter for Mr. Prakel would have resulted in a fundamental alteration in the nature of the court proceedings or an undue burden, we find that Defendants denied Mr. Prakel effective communication and the opportunity to enjoy the benefits of the state courts' services, programs, and activities.

### C. Intentional Discrimination

In order to recover compensatory damages under either the ADA or Section 504, Mr. Prakel must prove intentional discrimination. *See Love v. Westville Correctional Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996) (citation omitted). Our sister circuits are split on the applicable standard for showing intentional discrimination, with the minority of

circuits suggesting discriminatory animus as the proper standard and the majority

applying a deliberate indifference standard. *Compare Carmona-Rivera v. Puerto Rico*,

464 F.3d 14, 18 (2006), *and Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 575 (5th

Cir. 2002) (discriminatory animus), *with S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*,

729 F.3d 248, 262-64 (3d Cir. 2013), *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d

334, 348 (11th Cir. 2012), *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir.

2011), *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009), *Mark H.*

*v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008), *and Powers v. MJB Acquisition Corp.*,

184 F.3d 1147, 1153 (10th Cir. 1999) (deliberate indifference). The Seventh Circuit "has

yet to decide whether discriminatory animus or deliberate indifference is required to

show intentional discrimination." *Strominger v. Brock*, 592 Fed. App'x 508, 512 (7th Cir.

2014).

   After careful review of the applicable caselaw, we share the Third Circuit's

approach in concluding that the deliberate indifference standard more closely aligns with

the remedial goals of the ADA and Rehabilitation Act. *Durrell*, 729 F.3d at 264-65

(finding that requiring a plaintiff to prove discriminatory animus "would run counter to

congressional intent as it would inhibit § 504's [and the ADA's] ability to reach knowing

discrimination in the absence of animus"). Accordingly, we are following the majority of

circuits that have addressed this issue apply that standard here.

   To show deliberate indifference in the Title II and Section 504 context, Mr. Prakel

must establish that Defendants (1) knew that harm to a federally protected right was

substantially likely and; (2) failed to act on that likelihood.  *Liese*, 701 F.3d at 344

(quoting *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty, Fla.*, 610 F.3d 588, 604 (11th

Cir. 2010); *accord Meagley*, 639 F.3d at 389 (holding that deliberate indifference can be

"inferred from a defendant's deliberate indifference to the strong likelihood that pursuit

of its questioned policies will likely result in a violation of federally protected rights)

(quoting *Barber ex rel. Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1228-29

(10th Cir. 2009)).  Thus, a defendant need not have "actual knowledge" of a violation to

establish deliberate indifference, but rather need only have knowledge that harm to a right

is "substantially likely."  *Hunter on behalf of A.H. v. District of Columbia*, ___ F. Supp.

2d ___, 2014 WL 4071333, at *5 n.9 (D.D.C. Aug. 18, 2014) (citing *Liese*, 701 F.3d at

344).

    Although the parties have not pointed to nor has our research revealed a case in

which the Seventh Circuit has addressed the deliberate indifference standard in this exact

context, the Ninth and Tenth Circuits have held in addressing a failure to accommodate

claim that: "When the plaintiff has alerted the public entity to his need for

accommodation (or where the need for accommodation is obvious, or required by statute

or regulation), the public entity is on notice that an accommodation is required, and the

plaintiff has satisfied the first element of the deliberate indifference test."  *Duvall v.

County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001); *accord Barber*, 562 F.3d at 1229.

Here, Mr. Prakel clearly and on numerous occasions alerted both Dearborn Courts of his

need for a sign language interpreter to enable him to access his mother's criminal

proceedings, and, for the reasons discussed above, the accommodation Mr. Prakel requested was required by statute. Defendants were indisputably in a position to find and consult the applicable regulations and technical assistance and recognize the substantial likelihood that the failure to provide at least some sort of accommodation to Mr. Prakel to enable him to access public court proceedings as a spectator would violate his federally protected rights.[18] Accordingly, Mr. Prakel has established the first prong required to prove deliberate indifference.

Under the second prong of the test, a plaintiff must establish that the defendant deliberately failed to satisfy its duty to act in response to the accommodation request. *Duvall*, 260 F.3d at 1139-40. It is the defendant's duty to undertake a fact-specific investigation by gathering information from the plaintiff (and qualified experts, if necessary) to determine the proper accommodation required, giving "primary consideration" to the plaintiff's preference. *Id.* at 1139. Here, a reasonable jury could find that the Dearborn Courts made deliberate decisions to deny Mr. Prakel's requests without making sufficient effort to determine whether it would have been possible to provide the requested accommodation without fundamental alteration or undue burden, or to consider whether some alternate accommodation could be provided in an effort to

---

[18] Defendants argue that deliberate indifference requires a prior judicial finding that the challenged actions violate the law, but cite no caselaw in support of that contention. Even if that were a requirement (which it is not), in *Lane*, the United States Supreme Court addressed the obligation courts have to comply with Title II, explaining that the statute prohibits not only irrational disability discrimination, but also "a variety of other basic constitutional guarantees." 541 U.S. at 522-523. The Court proceeded to identify a number of constitutional guarantees related to attending and participating in court proceedings, including rights applicable to members of the public.

ensure that Mr. Prakel could understand and access the public court proceedings at issue. *Cf. id.* at 1140 (holding that the county court defendant engaged in intentional discrimination against the plaintiff, who was deaf, when it made a "deliberate decision to deny [the] requests for a particular auxiliary aid and service without making any effort to determine whether it would have been possible to provide the requested accommodation").

However, there is also evidence in the record from which a reasonable jury could conclude that Defendants did *not* exhibit deliberate indifference, given that Defendants did not entirely ignore Mr. Prakel's requests for an interpreter and that Ms. Prakel's attorney at least in some fashion indicated to both the Dearborn Superior and Circuit Courts that Mr. Prakel did not require an interpreter for the particular hearings in question.[19] Although, as discussed above, Ms. Prakel's attorney's conduct does not constitute a waiver of Mr. Prakel's rights because he never represented Mr. Prakel, we believe those facts are relevant in determining whether Defendants exhibited deliberate indifference to Mr. Prakel's requests. For these reasons, the deliberate indifference question must go to a jury. Accordingly, both Mr. Prakel's and the Dearborn Court

---

[19] As noted above, Judge Humphrey consulted with the Division on more than one occasion regarding Mr. Prakel's request in an effort to determine whether, as a spectator, Mr. Prakel was entitled to a court-provided interpreter and also discussed the matter with Ms. Prakel's attorney, Mr. Day, who represented that Mr. Prakel did not need an interpreter for the proceedings in Dearborn Circuit Court. Judge Cleary held a hearing at which he considered whether to provide Mr. Prakel an interpreter for his mother's proceedings in Dearborn Superior Court No. 1. At that hearing, Mr. Day indicated that, at least for the specific proceeding addressed at the hearing, Mr. Prakel did not require an interpreter. Both Mr. Day and the prosecutor mentioned the possibility of consulting the Judicial Commission or some other entity to determine whether Mr. Prakel was entitled to interpreter services for other criminal proceedings, however.

Defendants' Motions for Summary Judgment are <u>DENIED</u> as to Mr. Prakel's Title II and Section 504 claims.

## IX.    Conclusion

For the reasons detailed above, Plaintiffs' Motion for Summary Judgment is <u>DENIED</u>.  Defendants' Motion for Summary Judgment is <u>GRANTED IN PART</u> as to Ms. Prakel's claims brought against all Defendants and Mr. Prakel's claims brought against the State of Indiana, Chief Justice Rush in her official capacity, and the Division of Court Administration, and <u>DENIED IN PART</u> as to Mr. Prakel's claims brought against Judge Humphry, Judge Cleary, and Magistrate Schmaltz, in their official capacities.

IT IS SO ORDERED.

03/30/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kenneth Lawson Joel
INDIANA ATTORNEY GENERAL
kenneth.joel@atg.in.gov

William M. Horne
INDIANA ATTORNEY GENERAL
william.horne@atg.in.gov

Matthew Wilder Lorch
LORCH LAW OFFICE LLC
matthew@lorchlaw.com

Debra J. Patkin
NATIONAL ASSOCIATION OF THE DEAF LAW AND ADVOCACY CENTER
debra.patkin@nad.org

Patricia Orloff Erdmann
OFFICE OF THE ATTORNEY GENERAL
Patricia.Erdmann@atg.in.gov

Mary C. Vargas
STEIN & VARGAS, LLP
mary.vargas@steinvargas.com

Michael Stein
STEIN & VARGAS, LLP
michael.stein@steinvargas.com

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov

William Francis Lynch
US DEPARTMENT OF JUSTICE
william.lynch@usdoj.gov